[Civ. No. 9905. First Appellate District, Division One.—November 27, 1936.]

T. J. HALLINAN, Plaintiff and Appellant, v. KIRK H. PRINDLE, Defendant and Respondent; CHURCH OF ST. MATTHEW MILLS MEMORIAL HOSPITAL (a Corporation) et al., Defendants and Appellants.

Ross & Ross, Redman, Alexander & Bacon for Defendants and Appellants.

Vincent W. Hallinan for Plaintiff and Appellant.

Hadsell, Sweet, Ingalls & Lamb for Defendant and Respondent.

THE COURT.—The action was brought to recover damages for an injury suffered by plaintiff as the result of the alleged negligence of the defendants in connection with an operation performed by defendant Kirk H. Prindle, a physician and surgeon, at the hospital of the corporation defendant, and for the pain, suffering, etc., occasioned thereby. The cause was tried before a jury. At the conclusion of the plaintiff's case the defendant, Church of St. Matthew Mills Memorial Hospital, moved the court to grant a nonsuit, which was denied; and at the close of the evidence this defendant moved

for a directed verdict in its favor, as did also the plaintiff as against defendants Prindle and MacKinnon. These motions also being denied, the jury returned a verdict against the hospital and Ann M. MacKinnon (the latter being a nurse in the employ of the hospital) for the sum of $12,500, but exonerated Dr. Prindle from any liability.

Thereafter motions by defendant hospital for judgment notwithstanding the verdict and for a new trial were denied, as also were motions by defendant MacKinnon for a new trial and by the plaintiff for judgment against defendant Prindle notwithstanding the verdict and' for a new trial as to the same defendant. Judgment was entered in accordance with the verdict.

Appeals have been taken by the defendants hospital and MacKinnon as it affects them, and by the plaintiff from that part thereof in favor of defendant Prindle.

We will consider first the appeal of the plaintiff. It is based upon his contentions (1) that his motion for a directed verdict should have been granted for the reason that the uncontradicted evidence in the case shows that his injury was caused by the negligence of Ann M. MacKinnon, the nurse, in making preparations for the operation, and that in so doing she was the agent of Dr. Prindle, who accordingly is liable for such negligence; (2) that the trial court committed error in admitting evidence of the custom of physicians and surgeons of good standing in San Mateo County— where the operation was performed—to accept from a graduate trained nurse instruments, medicines and drugs without making a test thereof themselves, and (3) in the giving of certain instructions to the jury.

With the exception of the extent of the plaintiff's injuries there is no dispute between the parties as to the facts of the case. So far as they are pertinent to the plaintiff's appeal they may be summarized as follows: Dr. Kirk H. Prindle practices his profession in the county of San Mateo, where also is situated the Church of St. Matthew Mills Memorial Hospital—generally known as the Mills Memorial Hospital. Ann M. MacKinnon is a graduate trained nurse in the employ of the hospital. At the time of the occurrence giving rise to this action she had actively followed her calling for thirteen years, and was then and had been for several years in charge of the operating or emergency room of the

hospital. In this room and in the charge of Miss MacKinnon was a cabinet, on the shelves of which were various drugs and other substances, some of which were kept in bottles bearing appropriate labels. Among her duties was that of replenishing these bottles or other receptacles when necessary. For the use of this room for an operation and for the incidental service of the nurse the hospital made a charge directly to the patient, and it was at the disposition of surgeons unconnected with the hospital for the performance of operations on their patients.

In December, 1929, the plaintiff was suffering from a small dermoid cyst in the pelvic region. Dr. Prindle had previously treated him in connection with an operation for appendicitis, and the plaintiff consulted him about the cyst. The doctor advised its removal; but the cyst being at that time infected he recommended that the plaintiff have it treated in the hospital for a few days before operating. The latter, however—whose wife was a trained nurse—preferred to have this preliminary treatment done at home. The inflammation having subsided, he entered the hospital on December 9th for the operation. In the meantime Dr. Prindle had requested Miss MacKinnon to prepare for a minor operation, and informed her that he would use as a local anaesthetic a 1 per cent solution of novocain. In making these preparations Miss MacKinnon assembled on a tray various articles, including a knife, forceps, sterilized towels, gauze, a syringe, some needles and a medicine-glass containing a small quantity of a 4 per cent solution of formalin, which she had by mistake poured therein instead of novocain. Both novocain and formalin are colorless liquids, the former being odorless, but the latter having an odor which is quite noticeable if approached to the nostrils but not otherwise observable in the characteristic atmosphere of an operating room. Before commencing the operation the doctor made a general inspection of the tray but did not notice the substitution of the formalin for the novocain. He testified that doctors trust their nurses in preparing such a tray, and that they have no particular test to determine whether the instruments and towels have been properly sterilized, or whether one colorless liquid has been substituted for another. Formalin is a powerful disinfectant and germicide, being equally capable of killing live and preserving dead tissue. Taking up the

syringe Dr. Prindle drew into it a little of the liquid contained in the medicine-glass and injected three or four drops of it into the plaintiff in the immediate vicinity of the cyst. The patient instantly gave evidence of suffering great pain. Realizing that some mistake had been made the doctor at once smelt of the liquid and recognized it as being formalin. He immediately called for novocain and with it anaesthetized the affected area. He then completed the operation by removing the cyst, first, however, excising the area affected by the formalin—in extent about the size of a penny—and the plaintiff returned to his home. In a few days the wound became infected, and the plaintiff again entered the hospital, where he was treated by Dr. Prindle for three or four days. Thereafter daily for about three weeks he visited the doctor, who treated the wound and continued to do so every several days for a further period of two months, at the end of which time the plaintiff was discharged as cured.

We see nothing in this evidence to support the plaintiff's contention that Miss MacKinnon, in preparing the tray for the operation, was the servant or employee or even the agent of the doctor. While, if the doctor were performing such an operation at the home of the patient, or in his office, without assistance these preparations would necessarily devolve upon him, there is nothing in their nature which renders it improper or even undesirable that they be undertaken by another person, qualified by training and experience, acting in cooperation with the surgeon. This, in fact, under present-day conditions is what usually takes place. The patient enters a hospital, which is specially equipped with its operating room, modern surgical appliances and trained nurses for the purpose of rendering this precise service, and a charge therefor is made directly to the patient. The nurse in performing her duties in the operating room is acting for her employer, the hospital, and not for the operating surgeon, who cannot be held responsible for her negligent acts unless performed under conditions where, in the exercise of ordinary care, he could have or should have been able to prevent their injurious effects and did not.

The rule is thus laid down in 48 Corpus Juris, Physicians and Surgeons, section 144, page 1137: "A physician is not liable for the negligence of hospital or other nurses, attendants or internes who are not his employees if he has no knowl-

edge thereof, or has no connection therewith, or if it is not discoverable by him in the exercise of ordinary care, or unless he is negligent in permitting them to attend the patient.'' (Citing *Harris* v. *Fall*, 177 Fed. 79 [27 L. R. A. (N. S.) 1174] ; *Reynolds* v. *Smith*, 148 Iowa, 264 [127 N. W. 192] ; *Withington* v. *Jennings*, 253 Mass. 484 [149 N. E. 201] ; *Olson* v. *Bolstad*, 161 Minn. 419 [201 N. W. 918] ; *Hale* v. *Atkins*, 215 Mo. App. 380 [256 S. W. 544] ; *Broz* v. *Omaha Maternity etc. Hospital Assn.*, 96 Neb. 648 [148 N. W. 575, 579, L. R. A. 1915D, 334] ; *Covington* v. *Wyatt*, 196 N. C. 367 [145 S. E. 673] ; *Stewart* v. *Manasses*, 244 Pa. 221 [90 Atl. 574] ; *Malkowski* v. *Graham*, 169 Wis. 398 [172 N. W. 785, 4 A. L. R. 1524] ; *Wright* v. *Conway*, 34 Wyo. 1 [241 Pac. 369, 242 Pac. 1107] ; *Hunner* v. *Stevenson*, 122 Md. 40 [89 Atl. 418] ; *Perionowsky* v. *Freeman*, 4 Fost. & F. 977.) ''But it has been held that where a hospital nurse, although not in the regular employ of an operating surgeon, is under his special supervision and control during the operation the relation of master and servant exists, and that the surgeon is liable under the doctrine of *respondeat superior* for the nurse's negligence.'' (Citing *Aderhold* v. *Bishop*, 94 Okl. 203 [221 Pac. 752, 60 A. L. R. 137].) We think it plain from the evidence that the acts of preparation performed by Miss MacKinnon were not done under the special supervision and control of Dr. Prindle; on the contrary, as we have seen, they were performed by her in his absence. That they were done at his request or direction has no significance, since she was merely attending to duties devolving upon her as an employee of the hospital; and whether performed by her at the direction of an officer of the hospital made in pursuance of a previous notification by the doctor (as they well could have been), or upon the request of the doctor made directly to her, cannot affect the legal situation.

(2) It was not error on the part of the trial court to admit evidence of the custom of physicians and surgeons of good standing to accept from a graduate trained nurse instruments, medicines and drugs without making an examination thereof themselves. The jury was called upon to decide whether the defendant, Dr. Prindle, was chargeable with negligence in injecting into the body of plaintiff the liquid placed by the nurse in the medicine-glass. The test of such negligence is whether or not an ordinarily prudent person

would so act. Although jurors are presumed to know what an ordinarily prudent person would do under any and all circumstances, it must be of assistance to them to be informed what the practice is of persons habitually called upon to perform a given act, for it is obvious that such practice is most likely to be that which is suggested by ordinary prudence. "While a negligent act, clearly shown to be such, cannot be justified on the ground of custom or usage, and evidence of such custom or usage is not generally admissible for that purpose, evidence that a person charged with negligence followed the custom of other persons in the same line of business will be received on the question whether he acted as a reasonably prudent man would have acted under the circumstances of the particular case if the custom of itself is not negligent and unsafe." (Thompson on Negligence, sec. 7882.)

(3) The court gave to the jury the following instruction: "The plaintiff charges that prior to commencing said operation said defendant, Kirk H. Prindle, injected into the plaintiff's body a substance that was not an anaesthetic and that said substance was caused to be injected into plaintiff through the carelessness and negligence of the defendant Prindle. This is the only negligent act charged against said defendant. The only issue in the case, so far as Kirk H. Prindle is concerned is, did said Kirk H. Prindle act carelessly and negligently in administering said anaesthetic and, if so, was said carelessness and negligence a proximate cause of the injury complained of." It is urged by the plaintiff that this instruction is erroneous in that it limits the issue of negligence to the personal conduct of defendant Prindle, and states that as to him it was the only issue in the case.

Read in the light of the record it is plain to us that this instruction merely reminded the jury that no charge of negligence in the actual performance of the operation was made against the doctor but only in the administering of the anaesthetic, and other parts of the court's charge covered the question of his responsibility for the acts of third persons.

The court further charged: "If you find from the evidence that it was part of the service rendered by the Hospital to physicians operating in said hospital to prepare and furnish local anaesthetics to be used by physicians operating in said hospital, and if you further find that the defendant

acted without any negligence, then I instruct you that your verdict should be against the plaintiff and in favor of the defendant Prindle.'' This instruction is attacked on the ground that it eliminated the question of the doctor's responsibility for the mistake of the nurse. But it only eliminated this question if the jury should find that it was part of the service rendered by the hospital (at the charge of the patient) to furnish local anaesthetics—which, as we have seen, the uncontradicted evidence in the case showed to be the fact—and that this defendant was otherwise free from negligence.

The jury was further instructed:

''I instruct you that if you find from the evidence that a physician and surgeon following the same line of practice as the defendant, Prindle, in San Mateo, or similar localities, and exercising the degree of skill and learning ordinarily possessed by such physicians in such localities, would rely upon a nurse furnished by a hospital for the preparation of an anaesthetic to be used in an operation, and if you further find that such custom among surgeons—if there be one—is a reasonable custom, and that the defendant Prindle acted without any negligence, your verdict must be in favor of the defendant Prindle.''

''I instruct you that if you find from the evidence that the defendant, Ann M. MacKinnon, was a graduate nurse in the employ of the defendant Hospital, a corporation, and if you further find from the evidence that it was part of the service offered by the Hospital to physicians operating in it to have the anaesthetic to be used for operating . purposes prepared and supplied by an employee of the Hospital, and if you further find that physicians practicing in San Mateo county and similar localities and following the same line of practice as the defendant Prindle, in the exercise of ordinary care, would rely upon the selection and preparation of the anaesthetic by said hospital nurse, and you further find that such was the custom among surgeons—if you find that there was such a custom and that it is a reasonable one—I instruct you that your verdict will be in favor of the doctor.''

These instructions were followed by two or three variations of it. They are all attacked on the ground last men-

tioned, namely, that they eliminated the question of the doctor's responsibility for a mistake of the nurse.

We are of the opinion that since the evidence is without contradiction that the service referred to in these instructions was in fact rendered by the hospital through its qualified nurse, and that the preparation of the anaesthetic was done in the absence of defendant Prindle, there was nothing in the case upon which to predicate responsibility in this defendant on the doctrine of *respondeat superior*.

It follows from what we have said that the action of the trial court was correct in denying plaintiff's motions for a directed verdict, for judgment notwithstanding the verdict and for a new trial.

On the appeal of the defendants hospital and Ann M. Mac-Kinnon the points are made by one or both that (1) the charity doctrine exempts the defendant hospital from liability; (2d) the doctrine of *respondeat superior* exempts the defendant hospital from liability; (3) the doctrine of proximate cause exonerates the defendant hospital from liability; (4) the jury was misdirected to the prejudice of the defendant hospital, and (5) the damage awarded of $12,500 was excessive as a matter of law.

As we are of the opinion that the first of these points is fully sustained by the record it will not be necessary to consider the others in connection with the appeal of the hospital.

There is no conflict in the evidence concerning the purpose for which the hospital was founded, that it is a nonprofit organization devoted to the care of the sick either without payment or at a charge which is less than the cost of such care, nor in the manner in which its activities are carried on. We think the foregoing is demonstrated by a brief *résumé* of the evidence on those points.

In the year 1907 Mrs. Whitelaw Reid, daughter of D. O. Mills, a pioneer banker of this state, donated the necessary funds for the building of a small cottage on property belonging to the St. Matthew's Episcopal Church in San Mateo, the purpose of which was to provide a home for a district nurse charged with the duty of taking care of sick indigents of the community. One of the rooms of the cottage was equipped as an operating room in which emergency cases might be treated. Mrs. Reid later donated the further sum

of $30,000 for additional construction and equipment at the cottage, and the institution became known as the Church of St. Matthew Red Cross Hospital. In 1911 and under the direction of Mrs. Reid a nonprofit corporation under such name was formed to conduct and maintain the hospital, to establish a training school for nurses (this purpose was never carried out) and receive donations for such purposes. In 1921 the corporate name was changed to Church of St. Matthew Mills Memorial Hospital, the name which it now bears. Thereafter over one million dollars was donated to the corporation by Mrs. Reid and expended in land, buildings and equipment, so that from the modest five-room cottage in which the institution had its origin it has now developed into a modern hospital with accommodations for 125 patients housed in a class A building, and for 25 or 30 additional patients under emergency circumstances. Besides donating the sum mentioned for land, buildings and equipment Mrs. Reid settled a trust, devoting the income from two thousand shares of Spring Valley Water Company stock or the proceeds thereof to free beds, free clinics and free medical service for the poor and needy, and each year up to the time of her death in 1931 donated sufficient money to meet the deficits which occurred each year in the operation of the hospital. Not only was the institution incorporated as a nonprofit organization but the first article of its by-laws provides: "This institution has been incorporated as and shall be maintained as a nonprofit corporation." It has no stock nor stockholders; its directors, managers and officers charged with the conduct of its affairs serve without pay; poor, needy injured persons, without distinction of class or creed, are admitted to the hospital and treated either without charge or to the extent of part only of the cost of the service rendered. To persons able to pay a moderate charge for their care a rate of four dollars a day for a bed in a ward, and a charge of six dollars a day for a room, were established by Mrs. Reid; and in spite of regularly recurring annual deficits in the operation of the hospital Mrs. Reid refused to consider increasing these rates, and the directors have continued to respect the founder's wishes in this respect. The hospital also takes care of emergency cases, frequently involving indigents, for which no charge is made. The cost to the hospital of maintaining a patient

has varied from $8.82 per day in 1922 to $9.66 in 1931. The hospital has been made the beneficiary of various trusts, the income from which is directed to be devoted to the care of needy sick persons, and is so used. Notwithstanding this the financial statements of the institution's operations have shown annually an excess of expenditures over receipts with the exception of two years—in one of which the so-called profit was used to purchase new equipment. In these financial statements no account is taken of interest on the million dollar cost, nor of depreciation of buildings and equipment.

It is argued on behalf of the plaintiff that the hospital should not be regarded as a charitable institution inasmuch as a charge is made on the books against each patient, which in the case of an indigent person is met by crediting against it a corresponding amount taken from one of the trust funds mentioned, the plaintiff's idea apparently being that the charity received by this patient did not come from the hospital but from the trustor of that particular fund. This suggestion ignores the obvious fact that a charitable institution purports only to administer a fund—not to create, donate or earn it. The course adopted by the institution in respect of a needy sick person is as follows: A patient is admitted to the hospital. It is not known whether he is indigent or able to pay. The officers of the institution are humanitarian enough not to immediately pester him with questions as to his financial condition. He is merely regarded as a suffering human being needing the hospital's care. A bed is assigned to him and he is cared for. Automatically and as matter of bookkeeping his name is entered on the account books and a charge made against him. Can the entering of this charge be regarded as negativing the intention of the directors of the institution to care for the patient without charge if it should turn out that he is indigent or unable to pay? Obviously not. The evidence in the case shows that when the patient becomes in a proper physical condition inquiry into his financial ability is made, and if he is unable to pay, or only able to pay in part, the debit against him is either canceled or reduced—or what amounts to the same thing: it is balanced by crediting against it a corresponding amount from one or other of the trust funds above mentioned.

The particular course of procedure is of little consequence. It is the ultimate result which is to be regarded. Whether

these different trust funds be considered as several or in their aggregate amount of $15,000 of annual income, the whole sum is devoted to the purposes of the hospital, and the record shows that the annually recurring deficits arise principally from the expense of caring for sick indigent persons.

Also, as negativing the charitable character of the institution, the plaintiff calls attention to its practice of rendering bills to the county of San Mateo for the care of sick indigents, for certain emergency cases and for the service of its ambulance in conveying injured persons to or from the hospital.

As to these the record shows that the hospital is located in a territory fruitful of automobile collisions, giving rise to frequent calls upon it for emergency service, which it renders without any inquiry as to how or whether it will be paid for the service. By arrangement with the county authorities—who themselves maintain a community hospital for the care of the sick indigent of the county—if a person who has been admitted to the defendant hospital should prove to belong to the class of persons entitled to be received into the community hospital the defendant hospital transfers him there, and renders to the county a bill for the care and service which it has given to such person. Similarly the county pays to the defendant hospital a charge for ambulance service in such and analogous cases. It seems obvious to us that the result of such an arrangement is to enable the hospital to render its service to a wider class of sick persons, since by transferring to the county hospital persons entitled to be received there, and collecting from the county a charge for the service already rendered, room is provided in the defendant hospital for others who could not be admitted to that of the county, and its available funds for its own particular service are augmented.

Nor do we think that the charitable nature of the institution is to be judged solely by the gratuitous service it renders to indigent patients. We see no reason to doubt that the furnishing to persons of small financial ability of the best type of hospital care at a rate of payment below actual cost is a charitable undertaking. A large part of our population finds it difficult and sometimes impossible to pay the regular charges of a modernly equipped hospital conducted for profit. A prolonged sickness necessitating treatment in

such an institution is to many families a financial calamity. Service to such persons for a payment within their means but which is less than cost constitutes a distinct service to the community and, we think, comes fairly within the definition of charity adopted by our Supreme Court in the *Matter of the Estate of Merchant*, 143 Cal. 537 [77 Pac. 475, 477], namely, "A charity in a legal sense may be more fullly defined as a gift, to be applied consistently with existing law, for the benefit of an indefinite number of persons, either by bringing their hearts under the influence of education or religion, by relieving their bodies from disease, suffering or constraint, or assisting them to establish themselves in life, or by erecting or maintaining public buildings or works, or otherwise lessening the burdens of government." A liberal construction of the rule exempting charitable institutions from liability for the negligent acts of their employees, when due care is exercised in their selection and retention, works no injustice, since the principal ground upon which such liability is founded, namely, that the employer is using the services of the employee for his own profit, convenience or pleasure, is, in the case of a charitable institution, entirely lacking. And it must be remembered that the injured person is still left his remedy against the person whose negligence caused the injury.

That a hospital admitting and caring for indigent persons does not lose its character as a charitable institution because it also receives and cares for paying patients is well established by the following cases: *Thomas* v. *German General etc. Society*, 168 Cal. 183 [141 Pac. 1186]; *Burdell* v. *St. Luke's Hospital*, 37 Cal. App. 310 [173 Pac. 1008]; *Stonaker* v. *Big Sisters Hospital*, 116 Cal. App. 375 [2 Pac. (2d) 520]; *Ritchie* v. *Long Beach Community Hospital Assn.*, 139 Cal. App. 688 [34 Pac. (2d) 771]; *Shane* v. *Hospital of the Good Samaritan*, 2 Cal. App. (2d) 334 [37 Pac. (2d) 1066]; *Dingwell* v. *Seymour*, 91 Cal. App. 483 [267 Pac. 327].

We conclude on this point that no reasonable inference can be drawn from the evidence in the case that the Church of St. Matthew Mills Memorial Hospital is not properly classed as a charitable institution. It is not disputed that if properly classed as such it cannot be held liable for the negligent acts of its employees if it has used due care in their selection; and no contention is made—nor from the

record could there be—that any lack of care in this respect, particularly with regard to Miss MacKinnon, has been shown. It follows that the trial court erred in denying this defendant's motions for a directed verdict and for judgment notwithstanding the verdict.

This leaves for consideration the appeal of Ann M. MacKinnon. It could hardly be contended that Miss MacKinnon was not guilty of negligence in furnishing to Dr. Prindle a solution of formalin in place of the novocain requested. On a former appeal in this case (*Hallinan* v. *Prindle*, 220 Cal. 46 [29 Pac. (2d) 202]) the Supreme Court held that the evidence conclusively established such negligence; and the evidence presented on the present trial on that point was no different. It shows that Miss MacKinnon was quite familiar with the characteristics of novocain and formalin, that she was in charge of the cabinet in the operating room in which they were kept and had been for nearly two years; that it was among her duties to replenish from time to time as necessary the drugs and other substances kept in said cabinet, among them novocain and formalin, which were contained in bottles each labeled with the name of its contents. She accounted for her mistake by frankly admitting that she took no pains to read the label on the formalin bottle before pouring part of its contents into the medicine-glass.

It is urged on behalf of this defendant that the verdict of $12,500 is excessive to a degree that furnishes ground for holding that it was rendered under the influence of passion or prejudice.

The plaintiff gave testimony as to his injuries and the pain, inconvenience and disability resulting therefrom. We quote from his testimony: "I went into the emergency room in Mills Hospital and was prepared for the operation and put on the table, and then Dr. Prindle injected a fluid into me. There was a terrible burning sensation and I screamed with pain and was in a terrible state of agony. After several further injections the pain stopped. Dr. Prindle then cut out the cyst and I was in the hospital about one and a half hours. I walked out and drove my car home, and was in a shaky condition and had a terrible pain from the operation. I remained in bed until the following day. The following Saturday he bandaged the wound, and the flesh around it was very much discolored and the wound had also swollen.

The only pain was in the area of the wound and in my back, and it was painful to stand up. I was in the hospital five or six days, and for three or four months afterwards Dr. Prindle treated me. The swelling had burst and the wound had broken down, and there was a deep hole a little larger than a dollar right in the center of the groin, and it was an open wound and the flesh was exposed, and every day he would cut out around the wound and bandage it. The treatment was painful at all times, but I would say the interior of the wound was dead and had no feeling. In healing the wound left a lip which is probably as long as my finger, and it crosses the center of my body, and there is a hole in the right side in which a lead pencil could be inserted, and a little less than half an inch deep. There is very little scar tissue there. If pressure is applied to it it causes pain, and it is sometimes irritating if I sit in the same position for any length of time. The scar is about one-eighth of an inch above the base of the penis. It has interfered with my matrimonial relations, and in the act of intercourse causes a terrific and lasting pain. It takes away any pleasure connected with the matrimonial relation.''

A medical witness of plaintiff gave corroborative testimony that pressure applied to the scar would produce pain. Contrary testimony on this point was given by the defendants' medical expert, who also stated his opinion that the scar could not possibly interfere with intercourse. This conflict in the evidence was resolved by the jury in plaintiff's favor.

''A finding of value or the amount of damages is ordinarily so much a matter within the exclusive province of the jury that it will not be disturbed by the reviewing court, and this is especially true where the verdict has been approved by the trial court.'' (4 Cor. Jur., Appeal and Error, sec. 2846, p. 869.) This general rule has long been followed in this state. (*Bartlett* v. *Hogden,* 3 Cal. 55; *Douglas* v. *Berlin Dye Works & Laundry Co.,* 169 Cal. 28 [145 Pac. 535].)

The power of the appellate court to reduce or reverse judgments on the ground that they are excessive exists only when the facts are such that the excess appears as a matter of law, or is such as to suggest at first blush passion, prejudice or corruption on the part of the jury. (*Bond* v. *United R. Co.,* 159 Cal. 270 [113 Pac. 366, Ann. Cas. 1912C,

50, 48 L. R. A. (N. S.) 687] ; *Hale* v. *San Bernardino etc. Co.,* 156 Cal. 713 [106 Pac. 83] ; *Diller* v. *Northern Cal. Power Co.,* 162 Cal. 531 [123 Pac. 359, Ann. Cas. 1913D, 908] ; *Zibbell* v. *Southern Pac. Co.,* 160 Cal. 237 [116 Pac. 513] ; *Swain* v. *Fourteenth Street R. R. Co.,* 93 Cal. 179 [28 Pac. 829] ; *Lynch* v. *Southern Pac. Co.,* 24 Cal. App. 108 [140 Pac. 298].) Subject to this limitation the damage resulting from pain, suffering or injuries of the nature of that here complained of, being incapable of exact measurement, its compensation in terms of money is necessarily only approximate, and must be left to the jury to determine.

It has been said that the best obtainable criterion of the reasonableness of a verdict is its conformity to the average amount awarded by juries in cases in which injuries of like nature and like extent have been sustained. (*Lockwood* v. *Twenty-Third Street R. Co.,* 15 Daly, 374 [7 N. Y. Supp. 663].) While it would be a hopeless task to search for cases exactly like the one at bar, some light also may, we think, be thrown on the question by comparing this verdict with others in amount similar or somewhat more or less, and noticing the character and degree of gravity of the injuries and disabilities for which they were awarded.

In the case of *Boa* v. *San Francisco-Oakland Terminal Rys.,* 182 Cal. 93 [187 Pac. 2], there was a verdict of $8,000, the injury sustained being a fracture of the neck of the femur rendering the injured person a permanent invalid; in *Moreno* v. *Los Angeles Transfer Co.,* 44 Cal. App. 551 [186 Pac. 800], one of $10,000 for crushing and permanent shortening of the leg; in *Grant* v. *Los Angeles Transfer Co.,* 45 Cal. App. 731 [188 Pac. 294], a verdict of $10,000 for compound fracture of and crushing of the leg below the knee; in *Klein* v. *Atchison etc. Ry. Co.,* 12 Cal. App. 285 [107 Pac. 147], a verdict of $8,500 for injuries resulting in rupture, chronic peritonitis and other ailments; in *James* v. *Oakland Traction Co.,* 10 Cal. App. 785 [103 Pac. 1082], $15,000 for lacerations, denuding of flesh and permanent disfigurement of the face, rendering it unrecognizable as a human face; in *Morgan* v. *Southern Pac. Co.,* 95 Cal. 501 [30 Pac. 601], a verdict for the same amount for serious injuries to different parts of the body, including the arm and shoulder, involving rupture of the ligaments, impairment of memory and probably permanent disability; in *Meek* v. *Pacific Elec. Ry. Co.,* 175 Cal. 53 [164 Pac. 1117], the same

sum, $15,000 for injuries of a serious and permanent nature, including loss of arm and impairment of health; and· $15,750 in the case of *Lynch* v. *Southern Pac. Co.*, 24 Cal. App. 108 [140 Pac. 298], for fracture of the bones of the leg, with fracture of some of the ribs, including sensory paralysis of the arm.

█ In the case at bar, as we have seen, there was no loss of earning capacity, and the verdict is based on acute, but brief, pain at the time of the injection of the formalin solution, some pain accompanying the treatment, and the effect of the operation upon the plaintiff's matrimonial relations as testified to by him. The first two of these elements would of course be compensated by the recovery of a comparatively trifling sum, and the main ground of the verdict must be the third. It is not at all clear from the record whether any of the matters of which the plaintiff complains, except the pain resulting from the injection, are the consequences of such injection and would not have occurred without it as the result of the excising of the cyst. Comparing the verdict of $12,500 in this case with those above set out our first impression that it is excessive is amply confirmed, and we think it is excessive to a degree to require its reduction under the rule of decision established by the authorities above cited.

For the several reasons above set forth the judgment in favor of defendant Kirk H. Prindle is affirmed; as to the defendant hospital the judgment is reversed; as to defendant Ann M. MacKinnon, if the plaintiff shall within five days from the going down of the *remittitur* file in the superior court a stipulation abating from the amount of the judgment the sum of $5,000, the judgment shall be affirmed subject to such abatement; and it is ordered that the cause be remanded to the superior court, with directions to enter judgment in favor of said hospital and for a new trial as to the defendant MacKinnon in the event said abatement shall not be made.

A petition for a rehearing of this cause was denied by the District Court of Appeal on December 26, 1936, and an application by appellants to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on January 25, 1937.