[No. B096811. Second Dist., Div. Seven. July 24, 1996.]

G. RUSSELL THOMAS et al., Plaintiffs and Respondents, v.
INTERMEDICS ORTHOPEDICS, INC., Defendant and Appellant.

---

**COUNSEL**

Arter & Hadden, Michael C. Zellers and Mary Kocsis for Defendant and Appellant.

Gerry DeSimone for Plaintiffs and Respondents.

---

**OPINION**

**JOHNSON, J.**—The underlying action was for personal injuries arising from both medical malpractice and general negligence. By special verdict a jury found both the orthopedic surgeon and prosthetic supplier negligent and assessed liability at 50 percent each for the plaintiffs' injuries.

The prosthetic supplier appeals from the judgment, claiming the trial court prejudicially erred in withdrawing the "captain of the ship" instruction in response to a jury question. We conclude the supplier's special instruction was erroneous under the law and facts of this case. Therefore, we hold the trial court did not err in withdrawing the instruction from the jury's consideration during deliberations.

### FACTS AND PROCEEDINGS BELOW

In 1984 respondent G. Russell Thomas had a total hip replacement. Defendant Dr. John Thompson performed the surgery. Thomas continued to lead a very active life. Among other activities, he sailed his own boat to the South Pacific. He and his wife, respondent Marjorie Elizabeth Thomas took an extensive European vacation during which he walked several miles every day.

In November 1991, Thomas lost his balance while cleaning his Jacuzzi. He leapt to the other side of the Jacuzzi to avoid falling in. He landed hard

on his feet and in an awkward manner. He heard a sound and felt a popping sensation in his hip.

A few days later he consulted with Dr. Thompson. From an examination and X-rays Dr. Thompson determined Thomas would have to undergo hip revision surgery to replace a broken component of the hip prosthesis. This particular component is commonly referred to as the plastic acetabular insert.

Dr. Thompson scheduled Thomas's surgery at Goleta Valley Hospital. This hospital did not keep an inventory of orthopedic prosthetic devices. Each component part costs thousands of dollars and a typical surgery could require having tens of thousands of dollars worth of parts immediately available, depending on what the surgeon found necessary to use or replace during a given operation. Industry custom when using a hospital which did not keep an inventory was to meet with representatives of suppliers of prosthetic devices to order a variety of prosthetic devices, components and instruments for a scheduled surgery to ensure all the necessary parts would be available to meet any contingency once surgery began.

Prior to Thomas's surgery Dr. Thompson met with John Gainor, a representative of appellant, Intermedics Orthopedics, Inc. (Intermedics). The purpose of the meeting was to discuss Thomas's upcoming surgery and to determine which prosthetic devices and components would likely be necessary to complete the surgery.

At trial Dr. Thompson testified he had a distinct recollection of this meeting. He and Gainor reviewed X-rays of Thomas's damaged hip using templates provided by Intermedics to determine the size of the required replacement parts. At the conclusion of the meeting Dr. Thompson advised Gainor of two potential procedures, depending on the condition of the existing femoral portion of the prosthetic. First, if the femoral component of the prosthetic was not damaged, it was Dr. Thompson's intention to only replace the existing plastic acetabular cup and insert. In this scenario, a complete series of 32-millimeter cups and inserts would be needed. Dr. Thompson preferred modular units to ensure a precise fit, as well as so-called "hooded" units which would lend stability and reduce the likelihood of dislocation. Alternatively, if the femoral component was damaged, Dr. Thompson would need a complete hip prosthetic. Due to improvements in medical technology since Thomas's initial surgery using a 32-millimeter head, Dr. Thompson requested a 28-millimeter femoral head with all the corresponding component parts. The smaller femoral head had become state

of the art in the orthopedic field and presented the advantage of greater stability.

Gainor, on the other hand, testified he did not recall any specifics of this meeting with Dr. Thompson. Gainor testified he did not recall exactly what Dr. Thompson ordered. Gainor said he did not take any notes during the meeting or fill out any order form for the equipment Dr. Thompson ordered. Gainor testified that after his meeting with Dr. Thompson he used his car phone to orally place Dr. Thompson's order with Intermedics's main office in Texas.

Gainor testified Intermedics had an error rate of between 15 and 20 percent. Thus, prior to the surgery he went to Goleta Valley Hospital to inspect the parts which Intermedics shipped for Thomas's surgery. At trial Gainor said he assumed Dr. Thompson had only ordered 28-millimeter size cups and inserts because that was the size shipped by Intermedics.

At trial the parties stipulated Gainor was an agent of Intermedics for purposes of the case.

As noted, each prosthetic device or component part costs thousands of dollars. Each part is packaged in sterile protective packaging. Once removed from its sterile environment the part can never be reused. To guard against waste, a representative of the prosthetic supplier is generally present during the surgery. He or she stays nearby in a nonsterile area and produces the part or instrument as the surgeon requires during surgery. The surgeon gives the order to the assisting nurse or technician who, in turn, gives the order to a circulating nurse in a quasi-sterile area, who then requests the part from the supplier's representative. The representative finds the box containing the requested part, removes the outer packaging and hands the contents to the circulating nurse who then passes it on to the surgeon.

The next day Thomas's surgery began as scheduled. Dr. Thompson ordered Thomas be placed under general anesthesia. Dr. Thompson then made an incision, cut aside the soft tissue structure and reamed a hole in Thomas's hip for a 32-millimeter acetabular cup. When ready, Dr. Thompson requested a 32-millimeter cup. Gainor advised there were no 32-millimeter cups present.

Gainor called hospitals in the Santa Barbara area to locate 32-millimeter cups. He was able to locate a prosthetic of the same size but none of the modular, "hooded" variety Dr. Thompson requested. It took Gainor approximately 30 minutes to drive to the other hospital to pick up the parts and

return to the operating room. All the while Thomas remained under general anesthesia.

After surgery Dr. Thompson tested Thomas's hip in the operating room. He noted it was unstable. The doctor concluded the leg was shorter than the other because the hip was not seated properly. In addition, the hip was more unstable than it otherwise would have been had a "hooded" cup been inserted.

Thereafter, Thomas's hip dislocated several times a day causing him pain, inconvenience and annoyance. It required multiple surgeries to correct the problem. However, the several surgeries caused a weakening of the muscles necessary to hold the prosthesis in place. At the time of trial Thomas required a crutch or cane to walk.

The jury found both Dr. Thompson and Intermedics negligent and apportioned liability 50 percent to each. The jury awarded a total of $775,000, including a small amount for Mrs. Thomas's claim for loss of consortium. Although two jurors disagreed with the decision against Dr. Thompson, the verdict against Intermedics was unanimous.

## DISCUSSION

*The Trial Court's Withdrawal of the Modified "Captain of the Ship" Instruction in Response to a Jury Question Was Proper.*

At trial Dr. Thompson presented expert testimony the standard of care in the community was for an orthopedic surgeon to rely on the prosthetic device supplier to ensure all ordered components were present and available prior to surgery. Experts testified a surgeon was not required to personally inspect each suture, instrument or prosthesis prior to commencing surgery any more than it was a surgeon's responsibility to personally inspect an anesthesiologist's equipment prior to ordering general anesthesia.

During his testimony Dr. Thompson acknowledged he apologized to Thomas and told him that, like a captain of a ship, he felt personally responsible for the surgery not being a success. Dr. Thompson admitted he did not personally make sure the necessary parts were present prior to beginning surgery. However, like the other medical experts, Dr. Thompson believed it was not the surgeon's responsibility to personally inspect every piece of equipment likely needed during a surgery before proceeding.

This testimony was refuted by Intermedics's medical expert who testified an orthopedic surgeon may not delegate responsibility for ensuring everything required for a given surgery is present prior to ordering a patient to be anesthetized.

During closing arguments counsel for the Thomases urged the jury to find both defendants liable and suggested each was equally responsible for their injuries. Dr. Thompson's counsel argued the jury should find it was unreasonable to require a surgeon to personally check equipment prior to surgery and to find Intermedics wholly responsible for the Thomases' injuries. Intermedics's counsel argued Dr. Thompson was to blame because, as "captain of the ship," he was responsible for every error or omission occurring during the surgery. Intermedics' counsel told the jury the trial court would give an instruction allowing them to place total blame on Dr. Thompson.

Counsel for Dr. Thompson objected and requested a sidebar. Intermedics' counsel stated he would be requesting BAJI No. 6.06, the instruction on the "captain of the ship" or "borrowed servant" doctrine. Counsel for the other parties objected. Ultimately they agreed to defer further discussion of the instruction when counsel for Intermedics agreed to delete any further reference to this instruction during the balance of his argument.

BAJI No. 6.06 is entitled "Liability of Surgeon for Negligence of Assistants and Nurses." This instruction provides: "Regardless of who employs or pays [a nurse] [or] [an assisting surgeon] who takes part in the performance of surgery or services incidental to such surgery, if, while engaged in any such service, [the assisting surgeon] [the nurse] is under the direction of a certain surgeon in charge, so as to be the surgeon's temporary servant or agent, any negligence on the part of any such assisting person is the negligence of such surgeon."

Outside the presence of the jury counsel for Intermedics argued for the instruction, claiming it was supported by the expert medical testimony. Counsel for Dr. Thompson urged the trial court to refuse the instruction. He claimed it was wholly inapplicable, would confuse the jury and would therefore do more harm than good. The Thomases' counsel did not argue strongly either way, believing a reasonable jury would recognize the instruction involving assisting surgeons and nurses as inapplicable and disregard it. The trial court expressed concern that, based on the evidence and arguments, the jury would absolve Dr. Thompson of any liability, a result the court found inappropriate. However, the trial court also expressed confidence in the jurors' intelligence and common sense. In balancing the various concerns the trial court agreed to include the instruction.

As noted, during trial the parties stipulated Gainor was an agent of Intermedics for purposes of the case. The trial court repeated this stipulation

in its final charge to the jury. The trial court also read an instruction, which unknown to the trial court and other parties, was a modified version of BAJI No. 6.06. The instruction prepared by Intermedics stated only: "Regardless of who employs or pays *an assisting person* who takes part in the performance of surgery or services incidental to such surgery, if while engaging in any such service *the assisting person* is under the direction of a certain surgeon in charge so as to be the surgeon's temporary servant or agent, any negligence on the part of *any such assisting person* is the negligence of such surgeon." (Italics added.) No one noted the discrepancy during the charge to the jury.

Shortly thereafter the jury sent a note to the trial court. The jury's note stated: "Under section 6.06 of the jury instructions, is John Gainor considered an assisting person in the operating room under Dr. Thompson's responsibility?"

At this point the parties discovered the discrepancy in the instruction and understood the jury's confusion caused by the conflicting instructions. The trial court held lengthy discussions about the propriety of the instruction as given in order to formulate a response to the jury's question. The trial court adjourned to allow all counsel to research and present argument on the issue. The next day the trial court heard argument and reviewed pertinent authorities. Ultimately, the trial court concluded to withdraw the instruction as given from the jurors' consideration. The trial court told the jury: "Ladies and Gentlemen, all of this delay, even before you undertook your deliberations, dealt with issues relating to the instruction which you asked about. You will recall that somewhere in those instructions I instructed you that some of these instructions apply and some of them don't. On reflection, after further analysis I have concluded that the instruction numbered 6.06, which was the instruction you asked about, whether or not Mr. Gainor was an assisting person in that surgery, is an instruction that does not apply. It was given in error and I'm instructing you to disregard that instruction in its entirety. Mr. Gainor was not an assisting person in the surgery for purposes of your deliberations.

"To the extent that you have deliberated or reached any tentative conclusions regarding vicarious liability on the part of Dr. Thompson because of any failing on Mr. Gainor, if any, I instruct you to reconsider that thoroughly and re-deliberate that question under the remaining instructions and the—in the context of the special verdict furnished you.

"It was argued to you this was two cases, the plaintiffs against Dr. Thompson and the plaintiffs against Intermedics and their agent, Mr. Gainor,

who is acknowledged to be their agent, and I instruct you and order you to deliberate the case in that fashion and reach a verdict, if you can, under the remaining instructions and disregard anything that is direct or implied in instruction 6.06."

Intermedics appeals from the judgment claiming it was reversible error for the trial court to respond to the jurors' question by withdrawing the special instruction. It claims evidence Dr. Thompson directed Gainor to locate and retrieve a 32-millimeter replacement insert was adequate evidence of his control over Gainor to warrant the instruction. Intermedics claims withdrawal of the instruction prejudiced its case because the concept of being "captain of the ship" was discussed during trial, the issue of who should be responsible for the omission was hotly contested at trial and in closing arguments, and the jury specifically sought guidance on the instruction and was then told to ignore it, thereby creating juror confusion.

The Thomases respond any error, confusion or prejudice was invited by Intermedics when it included an irrelevant instruction without any of the other parties' knowledge or consent. They argue the instruction had no application in this case because all parties had stipulated, and the jury was instructed, Gainor was an agent of Intermedics for purposes of suit.[1] In addition, the Thomases argue Intermedics' modified version of BAJI No. 6.06 is unsupported in the law because the "captain of the ship" doctrine has never been applied to persons other than assisting surgeons and nurses, and then only for acts occurring during the surgical procedure.

"A party has a right to jury instructions on his or her theory of the case, if they are reasonable and supported by the pleadings and the evidence, or any inference which may properly be drawn from the evidence. (7 Witkin, Cal. Procedure (3d ed. 1985) Trial, § 240, p. 246; *Anderson* v. *Latimer* (1985) 166 Cal.App.3d 667, 674 [212 Cal.Rptr. 544].) This right is designed to ensure the jury has 'a full and complete understanding of the law applicable to the facts' of the case before it. (*Bartosh* v. *Banning* (1967) 251 Cal.App.2d 378, 387 [59 Cal.Rptr. 382]; *Distefano* v. *Hall* (1963) 218 Cal.App.2d 657, 672 [32 Cal.Rptr. 770].) In deciding whether the trial court erred in refusing a requested instruction, the evidence must be viewed in the light most favorable to the party seeking it. (See *Anderson* v. *Latimer, supra,* 166 Cal.App.3d at p. 674; *Alvarez* v. *Felker Mfg. Co.* (1964) 230 Cal.App.2d 987, 998 [41 Cal.Rptr. 514].)" (*Sesler* v. *Ghumman* (1990) 219 Cal.App.3d 218, 223 [268 Cal.Rptr. 70].)

---

[1]In cases in which the evidence creates conflicting inferences, the question whether there was a special agency relationship with the surgeon is generally a question for the trier of fact. (See, e.g., *Truhitte* v. *French Hospital* (1982) 128 Cal.App.3d 332, 345 [180 Cal.Rptr. 152].)

We agree with Intermedics that its case suffered from the court's withdrawal of its special instruction. Had the instruction remained, the instruction would have authorized the jury to find Dr. Thompson 100 percent liable for both his own and Gainor's negligence. However, we discern no legally cognizable prejudice from the trial court's actions. ▇ Under the facts of this case, there was no legal basis to give the instruction. Gainor's omission in failing to order 32-millimeter replacement parts occurred at a time far in advance of the actual surgery. In addition, the decisions creating and applying the "captain of the ship" doctrine have never applied the doctrine to persons other than medical personnel lending hands-on assistance within the surgical arena during the medical procedure.

Authorities discussing the doctrine generally require both (1) the negligence occur during the surgical procedure (see Annot. (1970) 29 A.L.R.3d 1065 [cases discussing surgeon's liability for nurse's negligence depending on whether negligence occurred during course of operation]) and (2) by a medical professional who is actively assisting the surgeon in carrying out the operation before the "captain of the ship" doctrine will apply to impose total liability on the surgeon. (See, e.g., Annot. (1962) 85 A.L.R.2d 889 [cases discussing surgeon's potential vicarious liability in various contexts].) The general rule of law in this area is stated as follows:

▇ "A physician generally is not liable for the negligence of hospital or other nurses, attendants, or internes, who are not his employees, particularly where he has no knowledge thereof or no connection therewith. On the other hand, a physician is liable for the negligence of hospital or other nurses, attendants, or internes, who are not his employees, where such negligence is discoverable by him in the exercise of ordinary care, he is negligent in permitting them to attend the patient, or the negligent acts were performed under conditions where, in the exercise of ordinary care, he could have or should have been able to prevent their injurious effects and did not.

*"The mere fact that a physician or surgeon gives instructions to a hospital employee does not render the physician or surgeon liable for negligence of the hospital employee in carrying out the instructions.* Similarly, the mere right of a physician to supervise a hospital employee is not sufficient to render the physician liable for the negligence of such employee. *On the other hand, if the physician has the right to exercise control over the work to be done by the hospital employee and the manner of its performance, or an employee of a hospital is temporarily detached in whole or in part from the hospital's general control so as to become the temporary servant of the physician he assists, the physician will be subject to liability for the employee's negligence.*

"Thus, where a hospital employee, although not in the regular employ of an operating surgeon, *is under his special supervision and control during the operation*, the relationship of master and servant exists, and the surgeon is liable, under the doctrine of respondeat superior, for the employee's negligence. . . ." (70 C.J.S., Physicians and Surgeons, § 86, pp. 492-493, fns. omitted and italics added.)

The "captain of the ship" concept was first introduced in California in the appellate court decision in *Armstrong* v. *Wallace* (1935) 8 Cal.App.2d 429 [47 P.2d 740]. In *Armstrong* Dr. Wallace performed a cesarean operation on the plaintiff. During the operation a nurse employed by a hospital which operated as a nonprofit charitable corporation failed to remove a laparotomy sponge from the plaintiff's abdominal cavity. A few days after the operation the plaintiff began to show signs of infection. Approximately five weeks later another surgeon operated to remove the laparotomy sponge. A jury found in favor of the hospital and Dr. Wallace. The plaintiffs moved for new trial. The trial court granted the motion and the defendants appealed. (8 Cal.App.2d at p. 431.)

On appeal the appellate court reversed the new trial order as it applied to the hospital. Under then existing law nonprofit charitable hospitals were immune from suit as a matter of law. (8 Cal.App.2d at pp. 432-433.) However, the appellate court affirmed the new trial order as against the physician. "The doctor, at the request of the plaintiffs, performed a Cesarean operation and was assisted in the operation by the regularly employed nurses of the hospital, whose duties at the time of the performance of the operation, were to have charge of the operating room, and were then and there under the direction and control of, and obeyed the orders of Dr. Wallace." (8 Cal.App.2d at pp. 433-434.)

The *Armstrong* court concluded a surgeon should bear responsibility for the acts or omissions of medical personnel acting under his direction and control during the course of surgery and the jury should be so instructed on retrial. "The surgeon had the power and, therefore, the duty to direct the nurse to count the sponges as part of his work in the opening and closing of plaintiff's abdomen and the putting in and taking out of sponges, and it was his responsibility to see that such work was done. He cannot relieve himself of liability by any custom or rule requiring the nurses to count the sponges used and removed. The refusal of the court, therefore, to give an instruction based upon the principle as outlined by plaintiff, constituted error." (8 Cal.App.2d at p. 439.)

The "captain of the ship" doctrine was adopted by the California Supreme Court in *Ales* v. *Ryan* (1936) 8 Cal.2d 82 [64 P.2d 409]. In *Ales* the patient

died due to complications from a laparotomy sponge left in her abdomen during an operation to have her gall bladder removed. The *Ales* court agreed the responsibility for counting sponges used and removed during a surgery cannot be delegated to nurses. (8 Cal.2d at p. 104.) "The operation was performed under the immediate supervision and direction of the defendant and he is chargeable with notice of what was taking place about him which includes the important duty of observing whether a record of the number of sponges which are placed in the abdomen is being kept, and the responsibility of seeing that all sponges are removed before the incision is closed is upon him." (8 Cal.2d at p. 103.) Accordingly, the Supreme Court held the surgeon in charge could be held responsible for the negligent acts of the other surgeons and nurses who assisted him in the gall bladder operation. "The surgeon in absolute charge of and who is directing the operation, as defendant was doing under the admitted facts of the instant case, is responsible for the negligent act of the assistant in failing to remove a sponge from the abdomen." (8 Cal.2d at p. 105.)

In *Ybarra* v. *Spangard* (1944) 25 Cal.2d 486 [154 P.2d 687, 162 A.L.R. 1258] the plaintiff underwent an appendectomy. After the surgery he felt sharp pain in his shoulder and arm. His condition worsened until his muscles atrophied and he lost the use and motion of his right arm and shoulder. In his personal injury suit experts testified the plaintiff's paralysis was caused by trauma or injury by sprain or pressure applied between his right shoulder and neck. The Supreme Court found the res ipsa loquitur theory of liability particularly appropriate in the situation. The court also elaborated on the concept of how medical personnel assisting in a operation can become temporary agents of the surgeon in charge. "Every defendant in whose custody the plaintiff was placed for any period was bound to exercise ordinary care to see that no unnecessary harm came to him and each would be liable for failure in this regard. Any defendant who negligently injured him, and any defendant charged with his care who so neglected him as to allow injury to occur, would be liable. The defendant employers would be liable for the neglect of their employees; and the doctor in charge of the operation would be liable for the negligence of those who became his temporary servants for the purpose of assisting in the operation.

"In this connection, it should be noted that while the assisting physicians and nurses may be employed by the hospital, or engaged by the patient, they normally become the temporary servants or agents of the surgeon in charge while the operation is in progress, and liability may be imposed upon him for their negligent acts under the doctrine of *respondeat superior*. Thus a surgeon has been held liable for the negligence of an assisting nurse who

leaves a sponge or other object inside a patient, and the fact that the duty of seeing that such mistakes do not occur is delegated to others does not absolve the doctor from responsibility for their negligence. [Citations.]" (25 Cal.2d at pp. 491-492.)

 In each of these cases employing the "captain of the ship" doctrine the negligence occurred during the course of the operation by medical personnel who were actively participating in the surgical procedure. By contrast, in this case Gainor was not part of the medical team which actively assisted Dr. Thompson in performing surgery on Thomas. He was in a nonsterile area removed from the surgical arena. The sole purpose for his presence was to ensure no boxes containing components were opened except for those actually needed during the surgery. Indeed, had the hospital maintained an inventory of prostheses, Gainor's presence during the surgery would not have been required at all.

In addition, the negligence involved in this case did not occur during the medical procedure. It occurred far in advance of the surgery and outside Dr. Thompson's presence. Gainor either negligently placed the order for the prosthetic devices which Dr. Thompson specified would be required for Thomas's surgery or negligently verified Dr. Thompson's order as shipped. There is nothing in the evidence to suggest Dr. Thompson had the right to either supervise or control the manner in which Gainor placed the order with Intermedics.

When the negligence occurs outside the operating theater and in advance of the surgery courts have concluded the "captain of the ship" doctrine is inapplicable. For example, in *Hallinan* v. *Prindle* (1936) 17 Cal.App.2d 656 [62 P.2d 1075] the patient had a small dermoid cyst in the pelvic region. The doctor suggested it be removed. Prior to the procedure the doctor directed the nurse to prepare for the minor operation and requested as a local anesthetic a one percent solution of Novocain. The nurse prepared a tray containing the necessary instruments. However, the nurse inadvertently placed on the tray a container of 4 percent solution of Formalin instead of Novocain. Formalin is a powerful disinfectant and germicide capable of killing live tissue. When the doctor gave the injection the patient experienced great pain. The doctor then smelled the solution and realized it was Formalin. The cyst was successfully removed but the affected area later became infected and required daily treatment for weeks.

On appeal the court rejected the plaintiff's contention the doctor should be liable for the nurse's negligence on a theory of respondeat superior. The

court noted the undisputed evidence established the negligent preparation of the anesthesia was prepared by the hospital through its nurse in advance of the operation and in the absence of the doctor. (17 Cal.App.2d at p. 665.) The court found this evidence established no basis for finding the doctor vicariously liable. (*Ibid.*) "We think it plain from the evidence that the acts of preparation performed by [the nurse] were not done under the special supervision and control of Dr. Prindle; on the contrary, as we have seen, they were performed by her in his absence. That they were done at his request or direction has no significance, since she was merely attending to duties devolving upon her as an employee of the hospital; and whether performed by her at the direction of an officer of the hospital made in pursuance of a previous notification by the doctor (as they well could have been), or upon the request of the doctor made directly to her, cannot affect the legal situation." (17 Cal.App.2d at p. 662.)

In *Truhitte* v. *French Hospital, supra,* 128 Cal.App.3d 332 a sponge was left inside a patient during a hysterectomy. A jury found the hospital 50 percent liable and the doctor 45 percent liable for the plaintiff's injuries. On appeal the hospital argued it should be totally absolved from liability because the nurses who negligently assisted the doctor by erroneously confirming the sponge count were the temporary agents of the doctor in charge during the operation. The appellate court noted that under California law the surgeon in charge has a nondelegable duty to ensure all foreign objects are removed from a patient's body after surgery. However, the court rejected the notion the "captain of the ship" doctrine absolved the hospital for its own negligence. "[I]t does not follow that the hospital may escape liability for its independent negligence in failing to devise adequate sponge-accounting procedures or in negligently carrying out such procedures through its employee-nurses." (128 Cal.App.3d at p. 349.) The court noted that a reasonable inference from the evidence was the nurses negligently performed the initial inventory of sponges which occurred prior to surgery and "before the arrival of the surgeon." (128 Cal.App.3d at p. 350; see also *Marvulli* v. *Elshire* (1972) 27 Cal.App.3d 180 [103 Cal.Rptr. 461] [the doctrine does not apply where surgeon in charge had no control over, or right to control anesthesiologist].)

Similarly in the case at bar, Gainor's negligent act occurred prior to, and in preparation for, the surgery. The negligent act did not occur during the medical procedure. Although Dr. Thompson requested specific Intermedics' component parts and prosthetic devices he did not direct or control the procedures Gainor used in ordering the parts or in verifying the order as shipped. Moreover, the negligent agent in this case did not actively participate in the surgical procedure and therefore did not fall under Dr. Thompson's direction and control during the course of the surgery. Under these

circumstances Intermedics may not absolve itself from liability for its own negligent acts.

Under the circumstances of this case and based on the above authorities, Intermedics' instruction directing a surgeon in charge is responsible for the negligent acts of all "assisting persons" was neither supported by the facts or law. Accordingly, it was not error for the trial court to withdraw Intermedics's erroneous instruction during deliberations to prevent a miscarriage of justice.

## DISPOSITION

The judgment is affirmed. Respondents to recover their costs of appeal.

Lillie, P. J., and Woods, J., concurred.