[Civ. No. 39375. Second Dist., Div. One. Aug. 15, 1972.]

JOSEPHINE MARVULLI et al., Plaintiffs and Appellants, v.
H. DONEL ELSHIRE, Defendant and Respondent.

## COUNSEL

Gilbert, Thompson, Kelly, Crowley & Jennett, Burt J. Channing and William D. Jennett for Plaintiffs and Appellants.

Spray, Gould & Bowers and Eugene M. Genson for Defendant and Respondent.

## OPINION

**LILLIE, Acting P. J.**—While undergoing a hemorrhoidectomy performed at a Los Angeles hospital in May of 1967, plaintiff-wife suffered an adverse reaction ("hypoxia") to the anesthetic administered—her respiration either stopped or became shallow for a period of time fixed at from less than a minute to three minutes. After completion of surgery, following reestablishment of respiration, she was taken to the hospital's intensive care unit;

six days later, however, she had a relapse and lost consciousness for 10 days. After six weeks in the hospital, she was taken home. Plaintiff-husband testified that she was helpless—she could neither walk, talk nor see. His testimony was corroborated by Dr. Peter Rocovich, specializing in neurological surgery, who stated that as of the trial date (June 1969) plaintiff-wife (while improved) was still 100 percent disabled due to brain damage caused by lack of oxygen at surgery.

Plaintiffs' claims of medical malpractice were tried to a jury; after impanelment of the jury a settlement was effected as to defendant hospital and two defendant physicians, including the anesthesiologist; they were, accordingly dismissed from the case, and the trial continued as to the sole remaining defendant, the operating surgeon (Dr. Elshire). Plaintiffs appeal from judgment entered on an adverse jury verdict.

The sole assignment of error relates to two proposed instructions covering (in effect) the responsibility of defendant Elshire for the asserted negligence of the anesthesiologist and a hospital nurse, one Beyer, who assisted Dr. Elshire during the operation. The first, requested by plaintiffs, is in the language of BAJI No. 6.06;[1] the second is "DEFENDANT'S SPECIAL JURY INSTRUCTION No. 1."[2] Neither was given by the trial court; instead, the court prepared and read its own instruction covering the issue of vicarious liability.[3]

The following is a summary of certain relevant background facts. The anesthetic used on plaintiff-wife was a "caudal epidural," a local agent which deadened or numbed the patient's rectal area; this was supplemented

---

[1]"Regardless of who employs or pays a nurse, Assistand [sic] Physician, or any other attendant who takes part in the performance of surgery or in the performance of services incidental to such surgery if while engaged in any such service the nurse, assistant physician or attendant is under the direction of a certain surgeon in charge, so as to be his temporary agent, any negligence on the part of any such assisting person, occurring while the latter is under the surgeon's direction, is deemed in law to be the negligence of such surgeon."

[2]"You are instructed that if you find from the evidence that someone, not now a party to the case, was guilty of negligence and that such negligence was a proximate cause of injury to the plaintiff, you are not permitted to charge or impute that negligence to the remaining defendant, Dr. Elshire."

[3]"The legal liability, if any, on the part of defendant H. D. ELSHIRE depends upon whether or not any professional negligence on his part was a proximate cause of injury and damage to plaintiff. Professional negligence on the part of others not now parties to this action is not imputable as such to this defendant. However, in determining whether or not Dr. Elshire was himself guilty of professional negligence you shall consider his conduct as operating surgeon in light of all of the evidence bearing upon the subject including, but not limited to, his knowledge of the professional qualifications and professional conduct of all others participating in the diagnosis, care and treatment of Josephine Marvulli."

by an intravenous injection of sodium pentothal. Both were administered by Dr. Clifford Winchell who had served as a staff anesthesiologist at the hospital for some 18 months. Defendant Elshire had previously worked with Dr. Winchell on other occasions; he first learned of Winchell's assignment to the instant operation when he checked a bulletin board used for such purposes. No consultation was had between the two doctors about the type of anesthetic agent to be used, nor did Dr. Elshire know the content of the material used on the patient when he entered the operating room—he testified that "It is the prerogative that lies with the anesthesiologist." After Dr. Elshire had made a guide stitch at the base of the hemorrhoidal plexus to control bleeding followed by an elliptical incision, he noted duskiness of blood possibly indicating impaired respiration. He called this to the attention of Dr. Winchell who concurred in that view. The patient's position was then changed from prone to supine; her respiration was assisted by means of an instrument made of hard rubber with a hollow center and shaped to conform to the configuration of the oral cavity. (Both Dr. Elshire and Dr. Winchell insisted that this instrument was not an endotracheal tube, as testified to by at least one nurse, since [in the opinion of a defendant's expert] standard practice does not endorse the use of such tube when a caudal epidural anesthetic is administered.) Upon Dr. Winchell's assurance that it could safely be done, surgery was then continued and completed.

Plaintiffs called as a witness Lucille Beyer, a registered nurse at the hospital who assisted defendant Elshire at the operation; according to plaintiffs, since she had also assisted him on other occasions, she was Elshire's agent for the purpose of vicarious liability. They claim that such liability should be imputed to defendant because she testified that before the first incision was made she thought that the patient's anus and rectum looked rather dark—indicating the lack of oxygen; this was confirmed after the incision; she failed to mention these matters to Dr. Elshire immediately because "he is awfully sharp and I thought he would pick it up"; defendant said nothing until he started to remove the second hemorrhoid; the blood was still rather dark and defendant said, "Oh, my God, is she all right?" She further testified, "At this point I was muttering, 'The blood is black,' and Dr. Elshire said, 'Is she all right,' to Dr. Winchell, and he said, 'No, she isn't.' " The above testimony, we note, was substantially disputed by defendant Elshire.

Several days after the operation plaintiff-wife suffered a relapse involving the serious consequences hereinabove mentioned; there was a division of medical opinion as to the contributing causes therefor. Dr. Stubrin (one of the dismissed defendants) had been the admitting physician—he treated

plaintiff-wife for several months prior to her surgery. In his opinion, within three or four days his patient had completely recovered from the incident in surgery and then suffered a cerebral vascular accident; he also testified that the lining of the rectum was discolored because of a prolonged intake of a brownish-black laxative (cascara). Plaintiffs' witness, Dr. Rocovich, was of the opinion that the blackness of the blood indicated a lack of oxygen within the blood itself; that surgery should have been discontinued to allow the anesthesiologist to deal further with the problem; that hypoxia occurred with damage to the brain cells ultimately resulting in the relapse several days later; that such relapse was not due to a stroke or a cerebral vascular accident. Other divergent views of medical experts need not be mentioned or discussed.

In light of the foregoing matters, instructions on res ipsa loquitur were requested by both sides and read to the jury. It is not argued that the evidence does not substantially support the verdict eventually reached; rather, it is argued that a different determination might have resulted if certain instructions had, or had not, been given.

Plaintiffs first contend that the instruction requested by defendant (fn. 2, *supra*) "and given by the court improperly deprived [them] of the doctrine of *respondeat superior*." The simple answer to such claim is that the instruction was *not* given having been "refused" by appropriate notation of the trial court to that effect. There is thus no basis for the first of plaintiffs' assignments of error so carelessly asserted; we proceed, therefore, to the instruction requested by plaintiffs (fn. 1, *supra*) which the court refused.

The refused instruction was taken from BAJI No. 6.06 captioned "Liability of Surgeon for Negligence of Assistants and Nurses." The editors' comment thereto includes citation of *Ybarra* v. `Spangard,* 25 Cal.2d 486 [154 P.2d 687, 162 A.L.R. 1258], wherein the court noted, after earlier citation of *Ales* v. *Ryan,* 8 Cal.2d 82 [64 P.2d 409] (also cited in the comment), that "A hospital today conducts a highly integrated system of activities, with many persons contributing their efforts. There may be, e.g., preparation for surgery by nurses and internes who are employees of the hospital; administering of an anesthetic by a doctor who may be an employee of the hospital, an employee of the operating surgeon, or an independent contractor; . . . and post surgical care by the surgeon, a hospital physician, and nurses." (Pp. 493-494.) The court held that res ipsa loquitur applied under the facts there present. While unconscious under a general anesthetic the plaintiff suffered an arm and shoulder injury resulting in paralysis; it was, therefore, error for the trial court to nonsuit plaintiff. *Ybarra* was followed by *Seneris* v. *Haas,* 45 Cal.2d 811 [291 P.2d

915, 53 A.L.R.2d 124], wherein the court noted that " 'a nurse or physician may be the servant of a hospital, thus requiring the application of the doctrine of *respondeat superior* even though they are performing professional acts.' " (P. 831.) In *Seneris,* however, wherein it was sought to hold defendant obstetrician (Dr. Haas) for the alleged negligence of the anesthesiologist, the court concluded that he could not be held accountable for such acts when performed and completed prior to defendant's arrival in the delivery room.

Plaintiffs argue that *Seneris* is distinguishable; here, they say, the acts or omissions occurred while defendant Elshire was in the operating room and actively participating in the surgical procedure. It is urged that even if the jury accepted defendant's testimony that he was never informed of the dangers incident to a resumption of surgery, after the so-called "respiratory excursion" in question, the anesthesiologist nevertheless had a duty to do so; since this duty was breached and since the patient's improper ventilation was the probable cause of her later problems, a jury (fairly and properly instructed) could reasonably have found that defendant was negligent. ■ Of course, "In ascertaining whether it was error for the trial court to refuse to give appellant's instructions, this court views the evidence in the light most favorable to appellant. [Citations.]" (*Mau* v. *Hollywood Commercial Buildings, Inc.,* 194 Cal.App.2d 459, 466 [15 Cal.Rptr. 181].) However, before it can be viewed in said manner there must be evidence of some substance warranting the giving of the instruction in the first instance. "It is hornbook law that each party to a lawsuit is entitled to have the jury instructed on all of his theories of the case that are supported by the pleadings *and the evidence.*" (Italics added.) (*Phillips* v. *G. L. Truman Excavation Co.,* 55 Cal.2d 801, 806 [13 Cal.Rptr. 401, 362 P.2d 33].) Plaintiffs insist that Dr. Winchell had a duty to inform defendant of the patient's "excursion" but failed to do so, but the record does not appear to sustain such claim. Dr. Winchell testified that he kept defendant advised of everything that was transpiring; that while there was a very short period of time (less than a minute) when the patient was without spontaneous respiration, there was never a time during the entire operation when she was without some form of ventilation and respiration—"This lady was never without breathing for any time." Too, we are directed to no evidence which asserts that the standard of practice in the community gives an operating surgeon the right to exercise supervision or control over an anesthesiologist; defendant, on the other hand, produced evidence that the standard of practice is otherwise. A rather recent decision (not cited by either side) supports the latter view and sustains defendant's argument on this appeal that the *respondeat superior* relationship did not exist between him (as principal) and the anesthesiologist (as his agent).

In *Kennedy* v. *Gaskell,* 274 Cal.App.2d 244 [78 Cal.Rptr. 753] (hg. den.), the facts were similar in most respects to those at bar; unlike our case, however, the operating surgeon (Dr. Gaskell) discussed the selection of the anesthetic used with the anesthesiologist prior to surgery. After it was administered, and while Gaskell was in the scrub room preparing for the operation, the patient suffered a heart attack; Gaskell assisted in efforts to save the patient but he died 31 hours later. As here, the anesthesiologist was a specialist in his field; not wholly unlike our case, he was a member of a partnership of such specialists. Plaintiffs requested an instruction that Gaskell was liable as a *matter of law* for any negligence of the anesthesiologist; although such instruction was refused, the court did instruct the jury that it could determine from the evidence as a *matter of fact* that the anesthesiologist was Gaskell's agent. The verdict was in Gaskell's favor, and the sufficiency of the evidence to support that determination was not challenged on appeal; instead, it was argued that the court erred in not giving the instruction that the surgeon was liable as a matter of law if the jury found negligence on the part of the anesthesiologist.

While the reviewing court "did not meet the question" whether the jury properly could have found that the anesthesiologist was Gaskell's agent under the facts of the case, subsequent discussion points unerringly to the conclusion that it would have been error to do so. Thus, at pages 249-250 we find the following: "Substantial evidence was to the effect that the anesthesiologist was in full control of the administration of the anesthesia after being instructed on the type, nature and purpose of the anesthesia desired. We do not have a case of a surgeon negligently selecting an incompetent anesthesiologist. That would be a matter of a separate personal tort liability. We find no room, however, within the traditional scope of the doctrine of *respondeat superior* to impose liability upon the surgeon merely because of a choice of one among dozens of reputable licensed physicians specializing in anesthesiology. We share the rationalization of the Florida court in the *Dohr* case. (See fn. 2.)[4] It would make no more sense to stretch the *respondeat superior* doctrine to that extent than it would be to hold the plaintiff's family doctor liable for selecting a usually competent and skilled surgeon. The rule sought here of nondelegable responsibility could have mischievous results. It would not only permit but command that a specialist in one field of medicine—surgery—must supervise the precise

---

[4]The reference is to *Dohr* v. *Smith* (Fla. 1958) 104 So.2d 29, 32, where it was declared: ". . . The surgeon may have been generally in command from the beginning of the operation to the end or, as appellants term him in the brief, 'captain of the ship' but it is clear to us that he and the anesthetist were working in highly expert fields peculiar to each and that despite the common goal, the successful repair of the patient's ulcer, their responsibilities were not inextricably bound together. *Hudson* v. *Weiland,* 150 Fla. 523, 8 So.2d 37."

manner of performance by a practitioner in another specialized field—one in which ever increasing scientific knowledge demands greater and greater expertise."

█ Just as there was no showing that defendant had control, or the right to control, the action (or inaction) of Dr. Winchell, there was a similar failure of proof that he had any right to control the alleged inaction of Nurse Beyer when problems involving respiration made their appearance. Too, these problems pertained to matters within the jurisdiction of the anesthesiologist, not defendant; the latter, therefore, cannot be held vicariously liable for any inaction in the premises.

There is a further principle militating against plaintiffs' general claim that justice was not done below. The court drafted and read its own instruction (fn. 3, *supra*) declaring the law applicable to the problem presented; while such instruction did not allow the jury to impute directly to defendant the negligence of either Winchell or Beyer, it did allow consideration of their "professional conduct" in determining whether defendant was guilty of negligence. It has been said many times that when another instruction fully and fairly covers the law, complaint may not be made that a particular instruction, phrased in different language, was not given. (*Hooper* v. *Bronson,* 123 Cal.App.2d 243, 254 [266 P.2d 590].) No mention is made by appellants in their brief of the court's instruction or the effect thereof on the merits of their appeal; too, in light of the *Kennedy* case, perhaps the instruction gave them an advantage to which they were never entitled.

The judgment is affirmed.

Thompson, J., and Clark, J., concurred.