[No. B179848. Second Dist., Div. Two. Nov. 21, 2006.]

LARRY BAUMGARDNER, as Administrator, etc., et al., Plaintiffs and Appellants, v.
FRANK M. YUSUF et al., Defendants and Respondents.

COUNSEL

John C. Torjesen & Associates, John C. Torjesen; Esner & Chang, Stuart B. Esner and Andrew N. Chang for Plaintiffs and Appellants.

Law Offices of David J. Weiss, David J. Weiss; Greines, Martin, Stein & Richland, Martin Stein, Feris M. Greenberger and Jens B. Koepke for Defendants and Respondents.

OPINION

**DOI TODD, Acting P. J.**—O'Greata L. Fields (Fields) suffered injuries from a sponge left in her leg during surgery.[1] After settling with the hospital, she pursued a claim for negligence against the surgeon, respondent Frank M. Yusuf, and his professional corporation (collectively referred to as Dr. Yusuf). The jury found that Dr. Yusuf was not negligent. On appeal, Fields contends the trial court erred in refusing to instruct the jury on res ipsa loquitur, the nondelegable duty of a surgeon, and the "captain of the ship" doctrine. Based on *Ales v. Ryan* (1936) 8 Cal.2d 82 [64 P.2d 409] (*Ales*), we find prejudicial error and reverse the judgment.

## FACTS AND PROCEDURAL BACKGROUND

On September 11, 2002, 75-year-old Fields was admitted to the Henry Mayo Newhall Memorial Hospital for pain management after she sustained injuries from a fall in her home. An angiogram revealed that arteries to Fields's right leg were completely blocked due to advanced vascular disease. Fields's left leg had previously been amputated above the knee due to a similar condition.

On September 19, 2002, Dr. Yusuf performed arterial bypass graft surgery to install a new blood vessel in Fields's right leg, inserting sponges to absorb and stem the flow of blood. The postoperative notes show that two sponge counts were conducted and that the counts were correct. The next day, Dr. Yusuf performed a second surgery to remove a blood clot that had developed in the graft. Dr. Yusuf was assisted in this surgery by registered nurse Arlene Dene and scrub technician Marcial Camacho. Dr. Yusuf had

---

[1] Fields died subsequent to the filing of this appeal and the administrator of her estate was substituted in her place. For ease of reference, we continue to refer to appellant as Fields.

worked with both of these assistants for several years. During the second surgery, Dr. Yusuf again inserted sponges to absorb and stem the flow of blood. The postoperative notes indicate that there was only one sponge count during this surgery, and that Dr. Yusuf was informed that the count was correct. Unfortunately, a sponge was left in Fields's leg during this surgery.

In subsequent visits, Dr. Yusuf noticed that Fields's right leg and calf were swollen. On September 28, 2002, Dr. Yusuf realized the incision wound was infected, and opened and cleaned the wound. On October 12, Dr. Yusuf determined that the wound was still infected and on October 14, opened the wound and discovered a sponge deep behind Fields's right knee. He concluded that the sponge caused the infection, which had spread from the knee up to the groin incision. Dr. Yusuf cleaned the entire wound, confirmed that a pulse still existed, closed the incision, and left two drains in the leg. Gangrene developed in Fields's right leg and on October 18, Dr. Yusuf performed an above-the-knee amputation.

Fields filed a complaint for negligence against the hospital and Dr. Yusuf. The hospital settled with Fields before trial and is not a party to this appeal.

The evidence presented at trial on the issue of the sponge count included testimony from both plaintiff and defense experts, as well as Dr. Yusuf. Fields's expert testified that the surgeon and the nursing staff have "joint" responsibility for sponge counts, and that the surgeon has the ultimate responsibility to determine the course of an operation. He testified that it was a reasonable possibility that the sponge was left in Fields's leg after the sponge count was made and prior to the closing. He further testified that to his knowledge a double sponge count is standard procedure and opined that a surgeon who concluded an operation without calling for a second sponge count breached the standard of care to the patient. He later testified that the standard of care for surgeons is "that they are careful in assessing the operative field and assuring themselves as much as possible that sponges have been removed."

Dr. Yusuf's expert testified that in his opinion Dr. Yusuf complied with the standard of care for surgeons in connection with sponge counts because a surgeon routinely depends on the nursing staff to keep track of sponges and the surgeon relies on these counts. Dr. Yusuf's expert explained that hospitals develop their own protocol for performing sponge counts following "the rules and the regulations of the Joint Commission of Accreditation of Hospitals and the California Nursing Association." He testified that when a surgeon is told the sponge count is correct and the surgeon observes no foreign bodies prior to concluding the operation, the surgeon has satisfied his responsibility to the patient concerning the sponge count. He also testified that in performing an

operation on an extremity, two sponge counts are usually required, one on deep closure and one on skin closure, and that the standard of care for a surgeon who does not get a final sponge count on skin closure is to ask for a sponge count at that time.

Dr. Yusuf testified that the number and manner of taking sponge counts was a function under the control of the hospital nursing staff and not the responsibility of the surgeon. Under the hospital's protocol, the nurses decide how many sponges to prepare for surgery and how many sponge counts should be made during surgery. He testified that as a surgeon about to complete an operation, he had a duty to examine the wound for the existence of any foreign matter and to call for a sponge count from the nursing staff who would perform the count and advise him of the result. Dr. Yusuf saw no foreign matter in the area of the wound and was told that the count was correct. He then closed the wound and concluded the operation.

Fields requested that the trial court instruct the jury regarding res ipsa loquitur, nondelegable duty of a surgeon, and the captain of the ship doctrine. The court refused.

The jury found that Dr. Yusuf was not negligent, and the trial court entered judgment in his favor. Fields made a motion for new trial based on the trial court's refusal to give instructions on res ipsa loquitur and nondelegable duty. The trial court denied the motion. This appeal followed.

## DISCUSSION

### I. *Standard of Review*

■ "A party is entitled upon request to correct, nonargumentative instructions on every theory of the case advanced by him which is supported by substantial evidence." (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 572 [34 Cal.Rptr.2d 607, 882 P.2d 298].) The judgment may not be reversed on the basis of instructional error unless the error caused a miscarriage of justice. (*Id.* at p. 573.) "When the error is one of state law only, it generally does not warrant reversal unless there is a reasonable probability that in the absence of the error, a result more favorable to the appealing party would have been reached. [Citation.]" (*Id.* at p. 574.) " ' "A reviewing court must review the evidence most favorable to the contention that the requested instruction is applicable since the parties are entitled to an instruction thereon if the evidence so viewed could establish the elements of the theory presented. [Citation.]" [Citation.]' " (*Logacz v. Limansky* (1999) 71 Cal.App.4th 1149, 1157 [84 Cal.Rptr.2d 257].)

## II. *Res Ipsa Loquitur*

■ Res ipsa loquitur is a doctrine affecting the burden of producing evidence applicable to certain kinds of accidents that are so likely to have been caused by a defendant's negligence that, in the Latin equivalent, " 'the thing speaks for itself.' " (*Brown v. Poway Unified School Dist.* (1993) 4 Cal.4th 820, 825 [15 Cal.Rptr.2d 679, 843 P.2d 624] (*Brown*).) If applicable, the doctrine of res ipsa loquitur establishes a presumption of negligence requiring the defendant to come forward with evidence to disprove it. (*Id.* at p. 825; Evid. Code, § 646, subd. (b).)

The presumption that an accident was caused by the defendant's lack of care arises only when the evidence satisfies three conditions: (1) The accident must be of a kind that ordinarily does not occur unless someone is negligent; (2) the accident must be caused by an agency or instrumentality within the exclusive control of the defendant; and (3) the accident must not have been due to any voluntary action or contributory fault of the plaintiff. (*Brown, supra,* 4 Cal.4th at pp. 825–826.)

Fields contends the trial court committed prejudicial error by refusing to instruct the jury on the doctrine of res ipsa loquitur as stated in Judicial Council of California Civil Jury Instructions (2006) CACI No. 518 or BAJI Nos. 6.35 and 4.02.[2] Dr. Yusuf counters that the trial court correctly refused

---

[2] CACI No. 518, as requested by Fields, provides: "**Medical Malpractice: Res ipsa loquitur** [¶] In this case, [Fields] may prove that [Dr. Yusuf's] negligence caused her harm if she proves all of the following: [¶] 1. That [Fields's] harm ordinarily would not have occurred unless someone was negligent; [¶] 2. That the harm occurred while [Fields] was under the care and control of [Dr. Yusuf]; and [¶] 3. That [Fields's] voluntary actions did not cause or contribute to the event that harmed her.

"If you decide that [Fields] did not prove one or more of these three things, then you must decide whether [Dr. Yusuf] was negligent in light of the other instructions I have read.

"If you decide that [Fields] proved all of these three things, you may, but are not required to, find that [Dr. Yusuf] was negligent or that [Dr. Yusuf's] negligence was a substantial factor in causing [Fields's] harm, or both.

"You must carefully consider the evidence presented by both [Fields] and [Dr. Yusuf] before you make your decision. You should not decide in favor of [Fields] unless you believe, after weighing all of the evidence, that it is more likely than not that [Dr. Yusuf] was negligent and that his negligence was a substantial factor in causing [Fields's] harm."

BAJI No. 6.35, as requested by Fields, provides: "**MEDICAL NEGLIGENCE— CONDITIONAL RES IPSA LOQUITUR** [¶] You must decide the following questions concerning the injury involved in this case: [¶] Is it the kind of injury which ordinarily does not occur in the absence of negligence? [¶] Was the injury caused while the plaintiff was exclusively under the care or control of the defendant? [¶] If you find the plaintiff's injury was of a kind which ordinarily does not occur in the absence of negligence; that it was caused while the plaintiff was exclusively under the care or control of the defendant, you are instructed as follows:"

to give a res ipsa loquitur instruction because the evidence showed that the nurses had the primary responsibility for conducting sponge counts and communicating those results, and therefore the element of exclusive control was missing. We are not persuaded by Dr. Yusuf's argument.

We find *Ales, supra,* 8 Cal.2d 82 to be dispositive. In *Ales,* a patient died of a peritoneal infection after a sponge was left in her abdomen during gall bladder surgery. Each person present during the operation denied having counted either the sponges brought into the operating room or those used during the surgery. (*Id.* at pp. 89–91.) The nurses did not recall being asked to count the sponges, and the surgeon testified that it was the nurses' duty to count the sponges and that someone had announced the count was correct. (*Id.* at pp. 90–91.) Finding the doctrine of res ipsa loquitur applicable, the California Supreme Court stated: "The operation was performed under the immediate supervision and direction of the defendant and he is chargeable with notice of what was taking place about him which includes the important duty of observing whether a record of the number of sponges which are placed in the abdomen is being kept, and the responsibility of seeing that all sponges are removed before the incision is closed is upon him. [¶] . . . [¶] . . . This duty cannot be delegated . . . ." (*Id.* at pp. 103–104.) The court concluded: "The jury should have been instructed in unqualified language that if the surgeon closed the incision without first having removed the sponge, a *prima facie* case was thereby made against him as a matter of law, and it devolved upon the defendant to rebut the inference of negligence by showing that he exercised the degree of care required of him in the circumstances of the case. It is too clear for argument that leaving a sponge in the abdomen is a thing that does not ordinarily happen without an imputation of negligence on the part of the operator, and, as stated by the doctrine itself, 'the thing speaks for itself.'" (*Id.* at p. 106.)

Dr. Yusuf does not address *Ales* in the context of res ipsa loquitur. Instead, he relies on *Sherman v. Hartman* (1955) 137 Cal.App.2d 589 [290 P.2d 894], where the court found that the doctrine of res ipsa loquitur did not apply because the element of exclusive control was missing. There, a doctor assisting with a hysterectomy started a blood transfusion on the patient during surgery in the presence of the defendant surgeon. After the surgery was completed, the doctors accompanied the patient to her room and determined that the transfusion was working properly before they left the patient under the care of hospital personnel with instructions to watch her blood pressure.

---

BAJI No. 4.02 continues: **"RES IPSA LOQUITUR—PERMISSIBLE INFERENCE OF NEGLIGENCE** [¶] From the happening of the injury in this case, you may, but are not required to, infer that a cause of the occurrence was some negligent conduct by the defendant.

"However, you must not find that a cause of the occurrence was some negligent conduct by the defendant unless you believe, after weighing all the evidence in this case and drawing such inferences therefrom as you believe are warranted, that it is more probable than not that the occurrence was caused by some negligent conduct by the defendant."

(*Id.* at pp. 593–594.) During the surgeon's absence, the patient was injured when the infusion needle slipped out of the vein, causing blood to leak into the soft tissues. (*Id.* at p. 593.) The court found that at the time of injury the surgeon did not have exclusive control over the instrumentality because he left the patient in the care of a nurse who was trained to perform routine duties such as monitoring a transfusion. (*Id.* at p. 595.)

█ The factual circumstances are completely different here. Dr. Yusuf was in the operating room with Fields at all pertinent times, performing the surgery, which included closure of the surgical incision. Indeed, the *Sherman* court distinguished *Ales* on the basis that in *Ales*, "the failure of the nurses to count the sponges was during the operation and in the very presence of the surgeon operating. Certainly the operator has exclusive control of the nurses in the surgery and while he is there. The same is true while the nurses are with the patient in his presence." (*Sherman v. Hartman, supra,* 137 Cal.App.2d at p. 596.)

Dr. Yusuf also argues that he did not have exclusive control because it was at least equally probable that the nurses' negligence caused Fields's injury, relying on *LaPorte v. Houston* (1948) 33 Cal.2d 167 [199 P.2d 665]. In *LaPorte,* the Supreme Court concluded that the doctrine of res ipsa loquitur did not apply where the plaintiff was injured when his car lurched forward and struck him while a mechanic was working on the car. The court found that it was "at least equally probable that the accident was caused by some fault in the mechanism of the car *for which defendants were not liable* as that it resulted from any negligent act or omission of the mechanic." (*Id.* at p. 170, italics added; see also *McKinney v. Nash* (1981) 120 Cal.App.3d 428, 440 [174 Cal.Rptr. 642] [testicular atrophy not caused by instrumentality in the exclusive control of anesthesiologist because vascular damage was the likely cause of plaintiff's condition, rather than neurological damage due to administration of spinal anesthetic]; *O'Connor v. Bloomer* (1981) 116 Cal.App.3d 385, 391–392 [172 Cal.Rptr. 128] [res ipsa loquitur not applicable against assisting surgeons where a different replacement heart valve than plaintiff requested was installed because defendant doctors had no responsibility or control over the availability of the correct valve].) In each of these cases, it was equally probable that another cause over which the defendants *had no control* was responsible for the plaintiffs' injuries. Here, it is undisputed that the retained sponge alone caused Fields's injury, and *Ales* makes clear that a surgeon cannot delegate responsibility for removing sponges from a patient's body.

█ Moreover, in *Ybarra v. Spangard* (1944) 25 Cal.2d 486 [154 P.2d 687], the Supreme Court stated that the test for exclusive control "has

become one of right of control rather than actual control" (*id.* at p. 493), and that a plaintiff need not identify the particular negligent person or the particular instrumentality that caused his or her injuries (*id.* at p. 492). The court held that "where a plaintiff receives unusual injuries while unconscious and in the course of medical treatment, all those defendants who had any control over his body or the instrumentalities which might have caused the injuries may properly be called upon to meet the inference of negligence by giving an explanation of their conduct." (*Id.* at p. 494; see *Leonard v. Watsonville Community Hosp.* (1956) 47 Cal.2d 509, 514 [305 P.2d 36] [same].)

■ The trial court's failure to instruct the jury on res ipsa loquitur prejudiced Fields because it denied her the presumption of negligence. "The burden is not upon the plaintiff to show by evidence that the thing does not ordinarily happen if proper care is used by the surgeon, but an inference of negligence arises from the act itself which relieves the plaintiff of the *onus* of offering evidence as to a lack of care on the part of the defendant. The inference stands in stead of evidence." (*Ales, supra*, 8 Cal.2d at p. 106.) It is then "incumbent on the defendant to rebut the *prima facie* case so created by showing that he used the care required of him under the circumstances. The burden is cast upon the defendant to meet or overcome the *prima facie* case made against him. . . . The inference of negligence unrebutted is actionable negligence coming within the doctrine of *res ipsa loquitur* and is sufficient to support a verdict for the plaintiff." (*Id.* at p. 99.) "The jury should have been permitted to make a factual finding on the issue of the doctrine of res ipsa loquitur. If the jury determined that, in fact, the injury does not ordinarily occur absent negligence, the doctrine of res ipsa lo[q]uitur would have resulted in an inference of negligence that respondent may or may not have been able to overcome. We cannot hold the error harmless." (*Blackwell v. Hurst* (1996) 46 Cal.App.4th 939, 946 [54 Cal.Rptr.2d 209].)

We conclude that the judgment must be reversed because the trial court erred in refusing to instruct the jury on res ipsa loquitur.

## III. *Nondelegable Duty of a Surgeon*

Fields contends the trial court committed prejudicial error by refusing to instruct the jury that Dr. Yusuf was responsible for ensuring that all sponges were removed before he closed the incision, and that this duty could not be delegated to the nurses.[3] Dr. Yusuf argues that because the hospital had a

---

[3] The three instructions as requested by Fields provide: "No. 1 Duty to Remove Sponges [¶] It is the law of California that the surgeon's duty to remove all sponges and other foreign objects from the patient's body is nondelegable. That means that a surgeon cannot escape

specific protocol mandating that the nurses had the sole responsibility for conducting preoperative and surgical sponge counts, his only nondelegable duty was to visually and manually search the surgical field for sponges, a duty he discharged.

Once again we find *Ales* to be dispositive on the issue. In *Ales*, the surgeon similarly argued that because it was proper practice for a surgeon assisted by accredited nurses to "rely absolutely and solely upon the count and report of the nurses working under him as to whether all the sponges used in the operation have been properly accounted for," the surgeon was not liable if the count was reported incorrectly and a sponge was retained. (*Ales, supra,* 8 Cal.2d at p. 92.) But the Supreme Court rejected this argument: " 'The surgeon had the power and therefore the duty to direct the nurse to count the sponges as part of his work in the opening and closing of plaintiff's abdomen and the putting in and taking out of sponges, and it was his responsibility to see that such work was done. He cannot relieve himself of liability by any custom or rule requiring the nurses to count the sponges used and removed.' [Citation.]" (*Id.* at p. 105.) Thus, "the responsibility of seeing that all sponges are removed before the incision is closed is upon [the surgeon]." (*Id.* at p. 103.) Following *Ales*, the court in *Truhitte v. French Hospital, supra,* 128 Cal.App.3d 332 recognized that "[i]t is the law of California that the surgeon's duty to remove all sponges and other foreign objects from the patient's body is nondelegable." (*Id.* at p. 349.)

Dr. Yusuf argues that the nondelegable duty rule of *Ales* is outdated. Relying on the discussion in *Truhitte v. French Hospital, supra,* 128 Cal.App.3d at pages 345–346, he points out that *Ales* was decided at a time when nurses and doctors were regarded as independent contractors and many hospitals were protected from liability by charitable immunity. He argues that

---

responsibility for a sponge left in a patient's body by claiming another member of the operating team was negligent by failing to properly account for·it. [¶] *Truhitte v. French Hospital* (1982) 128 Cal.App.3d 332, 349 [180 Cal.Rptr. 152]."

"No. 4 Surgeon In Charge of Procedure [¶] 'You are instructed that defendant, Dr. Yusuf[,] was the physician in charge of the surgical procedure performed on Mrs. Fields and it was his duty and responsibility to see that all foreign objects were removed from the surgical site before he closed the incision. This duty and responsibility cannot be delegated to a nurse.' [¶] (Citing *Ales v. Ryan, supra,* 8 Cal.2d 82.)"

"No. 6 **Liability of Surgeon not Relieved by Nurses** [¶] The surgeon had the power and, therefore, the duty to direct the nurse to count the sponges as part of his work in the opening and closing of plaintiff's abdomen and the putting in and taking out of sponges, and it was his responsibility to see that such work was done. He cannot relieve himself of liability by any custom or rule requiring the nurses to count the sponges used and removed. [¶] *Armstrong v. Wallace* (1935) 8 Cal.App.2d 429, 439 [47 P.2d 740]; *Ales v. Ryan* (1936) 8 Cal.2d 82, 105 [64 P.2d 409]."

since *Ales* was decided, the independent contractor and charitable immunity bases for absolving a hospital from liability for negligent acts of its nurses have been abandoned in California. (*Truhitte v. French Hospital, supra*, at p. 346.)[4] But even if the charitable immunity doctrine has been abandoned, we cannot conclude that the surgeon's nondelegable duty to remove sponges from a patient's body has been abolished.

Dr. Yusuf suggests that the rationale for the nondelegable duty was largely a financial one, i.e., to ensure a "deep pocket" for an injured patient who was otherwise precluded from recovering against a hospital. He relies on language in *Maloney v. Rath* (1968) 69 Cal.2d 442 [71 Cal.Rptr. 897, 445 P.2d 513] (*Maloney*) to support his position. In holding that a motorist's duty to exercise reasonable care to maintain adequate brakes pursuant to the California Vehicle Code is nondelegable, the *Maloney* court stated: "To the extent that recognition of nondelegable duties tends to insure that there will be a financially responsible defendant available to compensate for the negligent harms caused by that defendant's activity, it ameliorates the need for strict liability to secure compensation." (*Id.* at p. 446.)

■ But financial responsibility is not the only rationale for imposing a nondelegable duty. In *Maloney,* the court noted that nondelegable duties are wide-ranging, and include activities which threaten a grave risk of serious bodily harm or death. (*Maloney, supra,* 69 Cal.2d at pp. 447–448.) "The statutory provisions regulating the maintenance and equipment of automobiles constitute express legislative recognition of the fact that improperly maintained motor vehicles threaten 'a grave risk of serious bodily harm or death.' The responsibility for minimizing that risk or compensating for the failure to do so properly rests with the person who owns and operates the vehicle. . . . and the discharge of the duty to exercise reasonable care in the maintenance of his vehicle is of the utmost importance to the public." (*Id.* at p. 448.)

Similarly, the surgeon in charge of an operation has the duty to minimize the risk to the patient. As the *Ales* court noted, "error on his part would result in certain and inevitable injury to the health and might cause the death of the patient." (*Ales, supra,* 8 Cal.2d at p. 104.) It is clear that a special relationship

---

[4] Indeed, in *Truhitte v. French Hospital, supra*, 128 Cal.App.3d 332, the court noted that although a surgeon has the nondelegable duty to remove sponges from the patient's body, "it does not follow that the hospital may escape liability for its independent negligence in failing to devise adequate sponge-accounting procedures or in negligently carrying out such procedures through its employee-nurses." (*Id.* at p. 349.)

exists between a patient and surgeon during surgery. The patient is usually unconscious rendering her helpless and vulnerable; the patient often has limited understanding of surgical procedures and no ability to control what is happening; and the patient has placed complete trust and confidence in the surgeon to exercise due care. We agree with Fields that this special relationship provides a sufficient basis to maintain the surgeon's nondelegable duty to remove foreign objects which have been placed in the patient's body during surgery.

■ Thus, we disagree with Dr. Yusuf that a nondelegable duty on the part of a surgeon is an outdated concept in today's modern world under the circumstances here. In any event, *Ales* has not been overruled. Thus, we are not free to reject the Supreme Court's imposition upon surgeons of a nondelegable duty to remove foreign objects from a patient's body. (*Truhitte v. French Hospital, supra*, 128 Cal.App.3d at p. 349; *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937] [doctrine of stare decisis requires courts exercising inferior jurisdiction to accept the law declared by courts of superior jurisdiction].)

■ Moreover, we hasten to add that the imposition of a nondelegable duty on the part of a surgeon to remove foreign objects used during surgery from a patient's body does not establish liability on the surgeon as a matter of law. There is nothing in *Ales, supra*, 8 Cal.2d 82, suggesting otherwise. Rather, imposition of such a duty simply places the burden on the surgeon to demonstrate how the retained object was reasonably overlooked. The surgeon defending a retained sponge case must therefore offer something more than expert testimony that the standard of care was met because surgeons rely on nurses to count sponges. The surgeon attempting to rebut the presumption of negligence in a retained sponge case must demonstrate that his or her failure to detect the retained object is reasonable under the facts and circumstances of the particular case.

We conclude that the failure of the trial court to instruct the jury that Dr. Yusuf had a nondelegable duty to remove foreign objects from Fields's body used during surgery was prejudicial error. Dr. Yusuf was allowed to shift responsibility away from himself by relying on the hospital's protocol for determining whether a sponge is left behind. Had the jury been properly instructed, there is a reasonable probability that it would have found in Fields's favor. (*Soule v. General Motors Corp., supra*, 8 Cal.4th at p. 574.)

## IV. *The Captain of the Ship Doctrine*

Finally, Fields contends the trial court committed prejudicial error by refusing to instruct the jury with BAJI No. 6.06[5] on the captain of the ship doctrine and instead instructing the jury with CACI No. 510.[6] We agree.

 The "captain of the ship" doctrine imposes liability on a surgeon under the doctrine of respondeat superior for the acts of those under the surgeon's special supervision and control during the operation. (*Thomas v. Intermedics Orthopedics, Inc.* (1996) 47 Cal.App.4th 957, 967 [55 Cal.Rptr.2d 197].) The doctrine has been explained as follows: " 'A physician generally is not liable for the negligence of hospital or other nurses, attendants, or internes, who are not his employees, particularly where he has no knowledge thereof or no connection therewith. On the other hand, a physician is liable for the negligence of hospital or other nurses, attendants, or internes, who are not his employees, where such negligence is discoverable by him in the exercise of ordinary care, he is negligent in permitting them to attend the patient, or the negligent acts were performed under conditions where, in the exercise of ordinary care, he could have or should have been able to prevent their injurious effects and did not. [¶] *The mere fact that a physician or surgeon gives instructions to a hospital employee does not render the physician or surgeon liable for negligence of the hospital employee in carrying out the instructions.* Similarly, the mere right of a physician to supervise a hospital employee is not sufficient to render the physician liable for the negligence of such employee. *On the other hand, if the physician has the right to exercise control over the work to be done by the hospital employee and the manner of its performance, or an employee of a hospital is temporarily detached in whole or in part from the hospital's general control so as to become the temporary servant of the physician he assists, the physician will be subject to liability for the employee's negligence.* [¶] Thus, where a hospital employee, although not in the regular employ of an operating surgeon, *is under his special supervision and control during the operation*, the relationship of master and servant exists, and the surgeon is liable, under the doctrine of respondeat superior, for the employee's negligence. . . .' " (*Id.* at pp. 966–967, quoting 70 C.J.S., Physicians and Surgeons, § 86, pp. 492–493.)

---

[5] BAJI No. 6.06 as requested by Fields, provides: "**Captain of the Ship Doctrine** [¶] Regardless of who employs or pays a nurse who takes part in the performance of surgery or services incidental to such surgery, if, while engaged in any such service, the nurse is under the direction of a certain surgeon in charge, so as to be the surgeon's temporary servant or agent, any negligence on the part of any such assisting person is the negligence of such surgeon."

[6] CACI No. 510, as given by the trial court provided: "**Derivative Liability of Surgeon** [¶] A surgeon is held responsible for the negligence of other medical practitioners or nurses who are assisting him during an operation if the surgeon has direct control over how they perform their duties."

As noted in *Thomas v. Intermedics Orthopedics, Inc., supra,* 47 Cal.App.4th at page 967, the captain of the ship doctrine was first introduced in California in *Armstrong v. Wallace, supra,* 8 Cal.App.2d 429, a retained sponge case. The *Armstrong* court concluded: "The surgeon had the power and, therefore, the duty to direct the nurse to count the sponges as part of his work in the opening and closing of plaintiff's abdomen and the putting in and taking out of sponges, and it was his responsibility to see that such work was done. He cannot relieve himself of liability by any custom or rule requiring the nurses to count the sponges used and removed." (*Id.* at p. 439.)

A year later, the captain of the ship doctrine was adopted by the Supreme Court in *Ales, supra,* 8 Cal.2d 82. The *Ales* court stated: "The surgeon in absolute charge of and who is directing the operation, as defendant was doing under the admitted facts of the instant case, is responsible for the negligent act of the assistant in failing to remove a sponge from the abdomen." (*Id.* at p. 105.) Later, in *Ybarra v. Spangard, supra,* 25 Cal.2d 486, a res ipsa loquitur case, the Supreme Court explained: "[W]hile the assisting physicians and nurses may be employed by the hospital, or engaged by the patient, they normally become the temporary servants or agents of the surgeon in charge while the operation is in progress, and liability may be imposed upon him for their negligent acts under the doctrine of *respondeat superior*. Thus a surgeon has been held liable for the negligence of an assisting nurse who leaves a sponge or other object inside a patient, and the fact that the duty of seeing that such mistakes do not occur is delegated to others does not absolve the doctor from responsibility for their negligence." (*Id.* at p. 492.)

Relying on *Truhitte v. French Hospital, supra,* 128 Cal.App.3d 332, Dr. Yusuf argues that the captain of the ship doctrine is outdated and ill fitted to the modern operating room. The *Truhitte* court expressly questioned whether the doctrine had any continuing viability given that "the vicarious liability of a surgeon for the independent negligence of nurses and other assistants is determined in the cases under the general rules of agency." (*Id.* at p. 348.) The *Truhitte* court explained, as we have noted above, that the captain of the ship doctrine arose from the need to assure plaintiffs a source of recovery for malpractice at a time when many hospitals enjoyed charitable immunity, which is no longer the case, and also noted that other jurisdictions were moving away from a strict application of the doctrine. (*Ibid.*) The *Truhitte* court further stated that the theory that the surgeon controls all activities of whatever nature in the operating room is unrealistic in present day medical care where today's hospitals hire, fire, train and supervise their nurse employees, implement surgery protocols and can absorb the risks of noncompliance. (*Id.* at pp. 348–349.)

But the *Truhitte* court ignores what we have already recognized as the special relationship between a vulnerable hospital patient and the surgeon

operating on the patient. A helpless patient on the operating table who cannot understand or control what is happening reasonably expects a surgeon to oversee her care and to look out for her interests. We find this special relationship sufficient justification for the continued application of the captain of the ship doctrine. Moreover, in light of the Supreme Court's expressions of approval of the doctrine in *Ales, supra,* 8 Cal.2d 82, and *Ybarra v. Spangard, supra,* 25 Cal.2d 486, we feel compelled to adhere to the doctrine.

■■■ Even assuming that the doctrine remains viable, Dr. Yusuf argues that the captain of the ship doctrine is not applicable here because no special employment relationship existed between him and the assisting nurses. Once again, Dr. Yusuf relies on *Truhitte v. French Hospital, supra,* 128 Cal.App.3d 332, which in turn cited to *Marsh v. Tilley Steel Co.* (1980) 26 Cal.3d 486 [162 Cal.Rptr. 320, 606 P.2d 355], a case involving "the interplay between tort and workers' compensation remedies." (*Id.* at p. 490.) In *Marsh,* the Supreme Court stated: "The special employment relationship and its consequent imposition of liability upon the special employer flows from the borrower's power to supervise the details of the employee's work. Mere instruction by the borrower on the result to be achieved will not suffice. Moreover, California courts have held that evidence of the following circumstances tends to negate the existence of a special employment: The employee is (1) not paid by and cannot be discharged by the borrower, (2) a skilled worker with substantial control over operational details, (3) not engaged in the borrower's usual business, (4) employed for only a brief period of time, and (5) using tools and equipment furnished by the lending employer." (*Id.* at p. 492.)

Dr. Yusuf argues that application of these factors cuts against finding a special relationship between him and the assisting nurses. While we recognize that the captain of the ship doctrine is part of the broader "borrowed servant" principle of vicarious liability in which a temporary, special employment relationship is created, we are not entirely convinced that strict application of these factors is necessary or warranted in a retained sponge case, and we have found no California case applying these factors to such a situation. Where an assisting nurse or scrub technician's negligence during surgery is sought to be imposed on the surgeon, it seems unlikely that the surgeon would ever be responsible for hiring, firing, training or paying the nurses or that the nurses would use equipment furnished by the surgeon. Even so, it was Dr. Yusuf as the surgeon, not the assisting nurses, who was responsible for the details of the operation. Dr. Yusuf argues that he had no right to exercise control over how and when the nurses conducted the sponge counts because these steps were spelled out by the hospital's protocols. But we are not persuaded by this argument. While it may be true that Dr. Yusuf did not control the manner in which the nurses counted the sponges, he had the authority and responsibility to direct that a count be made. As the surgeon in charge, he made the determination of when to exit a particular body cavity or

when the incision should be closed and therefore when to call for a sponge count. (See *Armstrong v. Wallace, supra*, 8 Cal.App.2d at p. 439; *Ales, supra*, 8 Cal.2d at p. 105.) Moreover, under *Ales*, Dr. Yusuf had the nondelegable duty to remove all sponges from the patient's body, and this duty is unaffected by any hospital protocols requiring sponge counts to be made by nurses.

 Cases cited by Dr. Yusuf finding the captain of the ship doctrine inapplicable are readily distinguishable. In *Marvulli v. Elshire* (1972) 27 Cal.App.3d 180 [103 Cal.Rptr. 461] and *Kennedy v. Gaskell* (1969) 274 Cal.App.2d 244 [78 Cal.Rptr. 753], the courts rejected the notion that a surgeon could be held liable under the doctrine of respondeat superior for the negligence of an anesthesiologist, over whom the surgeon has no right to exercise supervision or control. The courts reasoned that an anesthesiologist is an independent specialist in complete control of the anesthesia. By contrast, an assisting nurse is obligated to follow the commands of a surgeon and is under his supervision and control during the operation. Other cases such as *Hallinan v. Prindle* (1936) 17 Cal.App.2d 656 [62 P.2d 1075] (preoperative negligence) and *Sherman v. Hartman, supra*, 137 Cal.App.2d 589 (postoperative negligence) involve nursing errors made in the absence of the physician.

Finding the captain of the ship doctrine to be applicable, the question becomes whether Fields was prejudiced by the trial court's refusal to instruct with BAJI No. 6.06, which would have instructed the jury that any negligence on the part of an assisting nurse is the negligence of a surgeon if "the nurse is under the direction of a certain surgeon in charge." As noted, the court instead instructed the jury with CACI No. 510, which informed the jury that a surgeon is responsible for the negligence of assisting nurses "if the surgeon has direct control over how they perform their duties." We find the refusal to instruct with BAJI No. 6.06 was prejudicial.

Under CACI No. 510, the jury could have concluded that Dr. Yusuf could not be held responsible for the nurses' negligence in conducting the sponge count during the operation because he did not actually control the manner in which the count was made. But this instruction ignores that the doctrine of respondeat superior, as articulated by *Armstrong v. Wallace, supra*, 8 Cal.App.2d 429, and *Ales, supra*, 8 Cal.2d 82 (both of which are cited in the comments to BAJI No. 6.06), is not limited to the question of whether the surgeon had actual control over the particular function to be performed by the assisting nurse. Rather, these cases concern whether the physician had special supervision and direction over the details of the operation. The question to be answered by the jury is not whether Dr. Yusuf had control over how the sponge count was conducted, but whether he had the authority to

order the sponge count to be made under his supervision during the operation. CACI No. 510, which focuses only on the control element, is not a complete recital of the law of respondeat superior. Once again, we conclude it is reasonably probable that the jury might have reached a different result if it had been properly instructed on the captain of the ship doctrine. (*Soule v. General Motors Corp., supra,* 8 Cal.4th at p. 574.)

## DISPOSITION

The judgment is reversed and remanded. Appellant is awarded costs of appeal.

Ashmann-Gerst, J., concurred.

**CHAVEZ, J., Dissenting.**—I respectfully dissent.

> A. *The evidence did not support a res ipsa loquitur instruction as the element of exclusive control was missing*
>
> > 1. *Dr. Yusuf lacked exclusive control over the sponges for the sponge count*

Contrary to the majority, I conclude that the exclusive control condition, necessary for the giving of a res ipsa loquitur jury instruction, was missing on these facts. Rather than being factually akin to *Ales v. Ryan* (1936) 8 Cal.2d 82 [64 P.2d 409] (*Ales*), in my view the facts here are more similar to those of *Sherman v. Hartman* (1955) 137 Cal.App.2d 589 [290 P.2d 894] (*Sherman*).

In *Sherman*, the appellate court held that the trial court properly refused to give an instruction on res ipsa loquitur as to the defendant doctor who performed a hysterectomy on the plaintiff. Due to the plaintiff's blood loss and shock, an assisting doctor started a blood transfusion and determined that the plaintiff was in good condition and the transfusion was working properly before leaving the plaintiff in the care of hospital personnel with instructions to watch the plaintiff's blood pressure. It was undisputed that the injury occurred when the infusion needle slipped out of the vein and caused blood to go into the soft tissue during the defendant doctor's absence, while either the nurse or her replacement was in the room with the plaintiff. (*Sherman, supra,* 137 Cal.App.2d at p. 593.) The court held that the defendant doctor did not have exclusive control over the instrumentality because he left the plaintiff in the care of the nurse who was trained to perform routine duties such as monitoring a transfusion. (*Id.* at p. 595.) The court also stated that to require a surgeon to remain with a patient until a transfusion was complete would be time consuming and costly. (*Ibid.*)

Viewing the evidence here in the light most favorable to the contention that the instructions are applicable, the expert testimony established that Dr. Yusuf never controlled the sponge count. Fields's expert conceded that the nurses had the ultimate responsibility for the sponge counts and that the hospital protocol demanded the nurses conduct the counts. The logical inference is that the nurses at least shared control over the sponge count. This is justified by evidence that the hospital trained the nurses, who were required to conduct sponge counts in conformance with the hospital protocol, and to communicate those results to Dr. Yusuf.

The cases cited by Fields for the proposition that Dr. Yusuf had exclusive control over the sponges are distinguishable. In *Ybarra v. Spangard* (1944) 25 Cal.2d 486, 494 [154 P.2d 687], the plaintiff awakened from an appendectomy surgery with pain in his right arm, which gradually progressed to paralysis. The plaintiff could not identify who caused his injury and so filed an action for negligence against the nurse, the anesthesiologist, and two doctors. All the defendants had control over the instrumentalities that may have harmed plaintiff. Here, on the other hand, the evidence shows that the nurses, not Dr. Yusuf, had actual control and responsibility for the routine sponge count, which proved to be incorrect. Unlike *Ybarra*, here the potential tortfeasor was clearly identifiable.

Other retained sponge cases cited by Fields are factually distinguishable in that in those cases, unlike here, there was the element of the doctor's exclusive control. In *Ales*, our Supreme Court did indeed hold that the res ipsa loquitur instruction was proper in a case against the doctor where a sponge was left in a surgical site. At that time, the hospital evidently had no protocol requiring sponge counts, and the evidence of the manner in which the operating room functioned led to the then reasonable conclusion that the surgeon oversaw and had control over the entire procedure. That is not the situation here where the nurses had the sole responsibility for conducting sponge counts according to the hospital's rules and in fact did conduct the count, reporting it as correct. *Armstrong v. Wallace* (1935) 8 Cal.App.2d 429, 437–438 [47 P.2d 740] is also distinguishable. While the appellate court there found that the trial court erred in not giving a res ipsa loquitur instruction in an action against the doctor, neither the nurses nor the doctor conducted sponge counts and the doctor did not request a sponge count. It was not clear who actually exercised control over the sponge inventory and it was thus reasonable to hold all the defendants accountable on those facts.

Counting sponges is a routine task, like monitoring a blood transfusion, certainly within the scope of duties for highly trained nurses. As in *Sherman, supra*, 137 Cal.App.2d at page 595, Dr. Yusuf had the right to assume that nurses provided by the hospital had the proper training to conduct sponge

counts in accordance with the hospital protocol. Dr. Yusuf fulfilled his duty to visually and manually explore the wound before closing it. Since the sponge count did not come back as incorrect, he was not required to order a search of the operating room or an X-ray to uncover any missing sponge. He could have done no more.

Therefore, I conclude that here the trial court properly refused to give the res ipsa loquitur instruction as the evidence did not show that Dr. Yusuf had exclusive control over the sponges or their count.

> 2. *Exclusive control also did not exist because it was at least equally probable that the nurses' negligence caused the injury*

The purpose of the exclusive control requirement is to link the defendant with the probability that the accident was negligently caused. (*Newing v. Cheatham* (1975) 15 Cal.3d 351, 362 [124 Cal.Rptr. 193, 540 P.2d 33].) In *LaPorte v. Houston* (1948) 33 Cal.2d 167 [199 P.2d 665], our Supreme Court held that the doctrine of res ipsa loquitur did not apply where the plaintiff was injured when his car rolled forward and hit him while the defendant mechanic was working on it. The court held that it was equally probable that the shifting mechanism of the car could have been affected by some fault in the mechanism as by a negligent act of the mechanic. (*Id.* at p. 170; see *McKinney v. Nash* (1981) 120 Cal.App.3d 428, 440 [174 Cal.Rptr. 642] [testicular atrophy not caused by instrumentality in the exclusive control of anesthesiologist because vascular damage was the likely cause of plaintiff's testicular atrophy, rather than neurological damage due to administration of spinal anesthetic]; *O'Connor v. Bloomer* (1981) 116 Cal.App.3d 385, 392 [172 Cal.Rptr. 128] [surgeon did not have the exclusive control over aortic valve supplied by hospital, which in its answers to interrogatories took full responsibility for the error in providing an empty carton, causing the surgeon to use another type of valve].)

Likewise, here, it was at least equally probable that the nurses' negligence in counting the sponges was the cause of the injury to Fields. The nurses determined how many sponges were to be used in accordance with the hospital protocol and were solely responsible for the count. They, more likely than Dr. Yusuf, were responsible for the retained sponge.

> B. *The trial court properly refused to give nondelegable duty instructions*

The majority concludes that the trial court erred in failing to instruct that Dr. Yusuf was responsible for ensuring that all sponges were removed before he closed the incision and that this duty could not be delegated to the nurses.

In so doing they rely on *Ales* and *Truhitte v. French Hospital* (1982) 128 Cal.App.3d 332 [180 Cal.Rptr. 152] (*Truhitte*). Unlike the majority, I find *Ales* factually distinguishable from these facts. In *Ales*, although the surgeon was in charge of the operation, he did not undertake a visual or manual exploration of the wound to determine if there were any retained sponges. (*Ales, supra*, 8 Cal.2d at pp. 89, 102.) The nurse testified that she did not conduct the count, and there was no evidence that the hospital in *Ales* had any protocol requiring sponge counts. Therefore, responsibility for the removal and counting of the sponges could only rest on the surgeon. Here, on the other hand, the nursing staff had the sole responsibility and duty to conduct sponge counts under the hospital protocol. The hospital protocol mandated the number of sponge counts for each type of surgery, and required the nurses to give an audible count, and to notify the surgeon of each correct or incorrect count. The hospital's protocol specified that the nurses must conduct an initial count before the commencement of the operation, a cavity count at the close of any cavity, and a final count at skin closure. Dr. Yusuf's only nondelegable duty was to visually and manually search the surgical field for sponges before closing the incision, which, based on the evidence, he fulfilled.

Reliance on *Truhitte* for the proposition that the surgeon has a nondelegable duty to remove sponges and other foreign objects from the patient's body is also unavailing. At most, the court discussed the situation where an assistant became a temporary employee of a surgeon and further observed that when a patient in the 1970's entered a modern hospital operating room, equipped with both surgical appliances and nurses trained for surgical service, the nurse was acting for the employer hospital and not for the surgeon. Furthermore, the surgeon could not be held responsible for the nurse's negligent acts unless the surgeon should have been able to prevent the negligence. (*Truhitte, supra*, 128 Cal.App.3d at pp. 347–348.) Here, the evidence clearly established Dr. Yusuf's responsibility was to observe the wound for the existence of a foreign body, and after finding none, to call for the sponge count and close the surgical site once he had been assured of an accurate sponge count.

## C. *The captain of the ship doctrine does not apply here*

Assuming the viability of the aged doctrine,[1] there is no special relationship, justifying the captain of the ship jury instruction, as required by

---

[1] Dr. Yusuf draws our attention to the recent case from the Wisconsin Supreme Court which is almost factually identical to this case, where that court declined "to resurrect the anachronistic 'captain of the ship' doctrine" because with the development of modern full-care hospitals and the corresponding diminishing role of an individual doctor's control over the operating room, the doctrine across the country has "lost its vitality." (*Lewis v. Physicians Ins. Co.* (2001) 2001 WI 60 [243 Wis.2d 648, 627 N.W.2d 484, 493–494].)

*Truhitte*, established on these facts. It was the hospital and not Dr. Yusuf who had direct control over hiring, training, paying, and firing of nurses. The hospital and the nurses controlled the operational details by establishing protocols instructing the nurses on the number of sponge counts, when to perform the counts and how to perform the counts, without input from Dr. Yusuf. The nurses counted the sponges and opened up the packets before Dr. Yusuf ever stepped into the operating room. The hospital provided the sponges and surgical equipment. Dr. Yusuf did not have control or supervision over how the nurses performed their sponge count duties, and at most worked side by side in performing the surgery with the nursing staff for the relatively brief period of one and one-half hours.

### D. *No prejudice was suffered by plaintiff from the trial court's refusal to give the instructions*

Finally, Fields did not incur prejudice from the refusal of the trial court to give the requested instructions. In determining whether an error of instructional omission was prejudicial, the reviewing court must evaluate "(1) the state of the evidence, (2) the effect of other instructions, (3) the effect of counsel's arguments, and (4) any indications by the jury itself that it was misled." (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 580–581 [34 Cal.Rptr.2d 607, 882 P.2d 298] (*Soule*), fn. omitted.)

Here, even though the requested instructions were not given, Fields was able to fully present evidence that Dr. Yusuf controlled the nurses, and breached his duty of care to remove the sponges. The evidence, however, tended to compel the conclusion that Dr. Yusuf did not control or direct the nurses and that he discharged his duty with respect to the removal and counting of the sponges. This evidence was contradicted by other testimony which established that the nurses, and not Dr. Yusuf, had the duty to count sponges; that the nurses performed their duties under the direction and supervision of the hospital and not Dr. Yusuf; and that Dr. Yusuf fully performed his duty by searching the surgical site and announcing that he was closing.

While the particular instructions at issue here were not given to the jury, the jurors were told of the concepts of vicarious liability (Judicial Council of Cal., Civ. Jury Instns. (2003–2004) CACI No. 510) and substantial factor causation (CACI Nos. 431 & 500), which instructed that Dr. Yusuf could not avoid responsibility because another person was a substantial factor in causing Fields's injury. These instructions fully and fairly covered the law. (*Soule, supra*, 8 Cal.4th at pp. 580–581.) Nevertheless, the jury weighed the evidence and determined that Dr. Yusuf was not negligent, refusing to hold him liable for injury caused by the retained sponge.

I conclude that the trial court did not err in refusing to give the requested instructions and further, plaintiff was not prejudiced by the failure to give the instructions. I would affirm the judgment.

Respondents' petition for review by the Supreme Court was denied February 7, 2007, S149156.